OPINION OF THE COURT
Kristin Booth Glen, J.
This case raises a question of first impression in New York: whether sexual harassment not tied to threat of job reprisals violates the City of New York’s Law on Human Rights.[1]
Petitioner Norman Rudow (Rudow) seeks judicial review[2] of a December 31,1982 decision and order of the New *710 York City Commission on Human Rights (Commission) which assessed damages against him and his corporate employer upon finding that they had engaged in sexual harassment[3] of Ms. Brenda Alvarez (Alvarez). He requests an order vacating and setting aside the Commission’s decision and order as contrary to law and not supported by sufficient evidence on the record as a whole.
THE COMMISSION’S DECISION AND ORDER
The decision and order of the Commission reveals, in short, that Alvarez was subjected to a series of unwelcome sexual advances in the work place. During her first year at the job, Alvarez’s superior, a married man, asked her to join him for dinner and go away with him for the weekend.
Subsequently, the president of the regional office, petitioner Rudow, maintained a pattern of calling Alvarez into his office and touching her in a manner she found offensive. This practice culminated in a final office “conference” during which Rudow repeatedly stroked Alvarez’s sides and breasts.
As a result of this incident, Alvarez became so upset that, after complaining to her supervisor, Ricardo Sanchez (Sanchez) she left the office and was unable to return.
The Commissioner also found that other female employees were subjected to similar treatment by Rudow.
STANDARD OF' REVIEW
The standard for judicial review of the Commission’s findings is set forth in section Bl-9.0 of the Administrative Code of the City of New York. It states in relevant part: “The findings of the commission as to the facts shall be conclusive if supported by sufficient evidence on the record considered as a whole.”[4]
*711 The standard, as enunciated by the courts, is a deferential one. Although “sufficient evidence” has been interpreted to mean “substantial evidence” (Burlington Inds. v New York City Human Rights Comm., 82 AD2d 415, affd 58 NY2d 983), the court’s role is limited to reviewing the record “ ‘to determine whether there is a rational basis in it for the findings of fact supporting the agency’s decision’ ”. (300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d 176, 182; emphasis added.) This does not mean that the court can substitute its judgment for that of the Commissioner. Rather, as the Court of Appeals has stated, “where there is room for choice, neither the weight which might be accorded nor .the choice which might be made by a court are germane upon an analysis for the presence of substantial evidence before the commissioner”. (Supra, at p 180.)
The task of the reviewing court in cases like this increases in difficulty because discrimination is usually practiced in devious ways and by elusive methods. (State Div. of Human Rights v Kilian Mfg. Corp., 35 NY2d 201.) This makes the findings of the trier of fact, who had an opportunity to evaluate the demeanor of the witnesses, especially important. Thus, with regard to review of administrative findings in discrimination cases, the Court of Appeals has advised in State Div. of Human Rights v Wagner (39 NY2d 865, 866): “Unlawful discrimination in the present day is generally practiced in subtle ways (Matter of Holland v Edwards, 307 NY 38, 45) * * * That others would require stronger evidence to reach the ultimate factual inferences is not relevant. The inference-making function, as it is exercised at the evidentiary or fact-finding level, is exclusively that of the administrative agency (Matter of Pell v Board of Educ., 34 NY2d 222, 230; Matter of Holland v Edwards, supra, at p 44).” It is under this standard that the parties’ motions must be determined.
FINDINGS OF FACT
Petitioner Rudow argues that under the standard of review, the Commission’s decision and order cannot be sustained.
*712 Petitioner claims there are numerous material contradictions in Alvarez’s account of the events. He points, especially, toward the conflict between Alvarez’s and Sanchez’s testimony regarding the exact time at which Alvarez entered and exited Rudow’s office and what times she left the company’s office.[5] However, these minor contradictions are insignificant. It is not surprising that someone experiencing sexual harassment would find herself upset, flustered and unable to recall with exact certainty the precise times of her comings and goings. Indeed, such inconsistencies suggest that each of the witnesses told the truth as she or he remembered it rather than rehearsing one identical story.
Rudow also argues that Sanchez’s testimony is unreliable, because he is a “disgruntled former employee” who has his own claim for employment discrimination against the company based in part on retaliation for his testifying on behalf of Alvarez in the fact-finding process that preceded the hearing. This argument is unconvincing since it appears that Sanchez’s testimony in the fact-finding process (before he was discharged) is consistent with his testimony at the hearing (which was held after his discharge).
Moreover, the Commissioner’s finding that Sanchez’s testimony was credible is certainly rational. Any discharged employee is likely to have some anger toward his/her former employer and Sanchez honestly owned up to his. But Sanchez further testified that he did not wish to harm Rudow, because that was not in his nature. At any rate, if employees who have been fired must be disbelieved in job discrimination proceedings, an employer charged in such proceedings would be encouraged to terminate all those employees who might testify against it. Such a rule ; would clearly be unworkable and would be directly contrary to our antidiscrimination statutes.
*713 Rudow’s reliance on the fact that there were no firsthand witnesses to the incidents of sexual harassment is similarly misplaced, since, as the Court of Appeals has noted “ ‘One intent on violating the Law Against Discrimination cannot be expected to declare or announce his purpose. Far more likely is it that he will pursue his discriminatory practices in ways that are devious, by methods subtle and elusive — for we deal with an area in which “subtleties of conduct * * * play no small part”.’ ” (State Div. of Human Rights v Kilian Mfg. Corp., 35 NY2d, at p 209.) Nor does Alvarez’s failure to produce as witnesses the professionals whose aid she sought seriously detract from her claim.
Finally, Rudow argues that Alvarez’s account of the final incident between them is incredible. Here, too, the hearing officer’s assessment of the testimony should not be disturbed. The dispute between the parties over whether the door was locked so as to prevent entering or exiting the office is trivial. What matters is that Rudow conceded in his testimony that he may have closed the door.
Although technically Alvarez may have had an opportunity to leave, neither her remaining in the room nor her failure to verbally protest Rudow’s behavior constitutes acquiescence. Rudow’s contention fails to consider the power imbalance between employer and employee that often makes a worker in need of her job feel she must swallow such indignities. Moreover, it fundamentally misconceives the paralyzing bind in which sexual harassment places a worker. The employee suddenly finds herself treated not as a worker, but rather as a sexual being; yet the advances take place in the context of a work interaction, where the employer-employee relationship limits the acceptable responses. She may well become angry and wish to lash out, yet she reasonably fears adverse job consequences if she protests, even though no such overt threat is made. The fact that Alvarez was not discharged for rebuffing the advances of Clott, her former supervisor, has no bearing on whether she might reasonably have feared being fired by Rudow.
Rudow’s theory that Alvarez concocted this entire story because she feared being terminated for her lateness does *714 not undermine the Commission’s finding. First, Alvarez had not received a formal warning about her hours since March of 1981; more significantly, she was promoted to her job as collector two months later. As this new position required the company to invest time in training her, it was hardly an indication of possible termination. Second, employees with problematic job histories are just as vulnerable to sexual harassment as others. It would indeed be unfair to discredit Alvarez’s testimony simply because she had displeased her employer in the past.
Petitioner Rudow strenuously objects to the introduction of the Donohues’ testimony that Rudow had previously harassed them, arguing that it would not have been admissible in a court proceeding. Case law suggests otherwise. The Federal courts have admitted such testimony to support an allegation that the employer maintained a discriminatory atmosphere. (See, e.g., Henson v City of Dundee, 682 F2d 897, 899; Bundy v Jackson, 641 F2d 934, 940, n 3.) In fact, petitioner called six female employees who testified on his behalf. The Commission considered their testimony for what it was worth but apparently concluded that even if some other women were not harassed by Rudow, respondent Alvarez and others could still have been so treated, in violation of the Administrative Code.
Having reviewed the record, it is clear that there was ample evidence on which the Commission could base its findings of fact. Thus, the issue to be resolved is whether these facts support a legal conclusion that petitioner committed sexual harassment in violation of section Bl-7.0 of the Administrative Code.[6] For the reasons stated below, I find the Commission’s determination is supported by the law.
ANALYSIS OF THE LAW
There has been a paucity of State judicial opinions on sexual harassment. While it appears that such a cause of action exists (at least under the State Human Rights Law; *715 see Matter of State Univ. of N. Y. v State Human Rights Appeal Bd., 81 A.D2d 688, affd 55 NY2d 896; Fletcher v Greiner, 106 Misc 2d 564), there is no binding authority defining its parameters. Accordingly, a review of the Federal cases interpreting title VII of the Civil Rights Act of 1964, as amended (US Code, tit 42, § 2000e et seq.)[7] is necessary.
Initially, Federal District Courts faced with discrimination suits alleging sexual harassment were reluctant to recognize a cause of action under title VII. (E.g., Miller v Bank of Amer., 418 F Supp 233, revd 600 F2d 211; Tomkins v Public Serv. Elec. & Gas Co., 422 F Supp 553, revd 568 F2d 1044; Come v Bausch & Lomb, 390 F Supp 161; Barnes v Train, 13 FEP Cases 123, revd sub nom. Barnes v Costle, 561 F2d 983.)
On appeal to the circuit courts, three of these cases (Miller v Bank of Amer., supra; Tomkins v Public Serv. Elec. & Gas Co., supra; Barnes v Costle,, supra) were reversed. The Tomkins opinion is representative in its holding that title VII is violated whenever “a supervisor, with the actual or constructive knowledge of the employer, makes sexual advances or demands toward a subordinate employee and conditions that employee’s job status — evaluation, continued employment, promotion, or other aspects of career development — on a favorable response to those advances or demands, and the employer does not take prompt and appropriate remedial action after acquiring such knowledge.” (Tomkins v Public Serv. Elec. & Gas Co., 568 F2d 1044, 1048-1049, supra.) Many other courts followed suit. (E.g., Miller v Bank of Amer., 600 F2d 211, supra; Barnes v Costle, 561 F2d 983, supra; Garber v Saxon Business Prods., 552 F2d 1032; Heelan v Johns-Manville *716 Corp., 451 F Supp 1382; Munford v Barnes & Co., 441 F Supp 459.)
This marked the beginning of what has been termed the “quid pro quo” form of sexual harassment, i.e., harassment in which a supervisor demands sexual consideration in exchange for job benefits. (See MacKinnon, Sexual Harassment of Working Women, 32-47.) However, Professor MacKinnon has defined a second form of sexual harassment, dubbed “condition of work” harassment, in which the harasser creates an offensive work environment. This latter form was first recognized in a thoughtful, and well-reasoned opinion, Bundy v Jackson (641 F2d 934, supra).
In Bundy (supra), the plaintiff alleged sexual advances in the form of requests for sexual favors from several of her supervisors. She rebuffed these advances and alleged that, as a result, her progress as an employee was hindered although she was not terminated, nor were there any threats of termination. In considering the question “whether the sexual harassment of the sort Bundy suffered amounted by itself to sex discrimination with respect to the ‘terms, conditions, or privileges of employment’ ” (supra, p 943) in violation of title VII, the D. C. Circuit unanimously answered: “Though no court has as yet so held, we believe that am affirmative answer follows ineluctably from numerous cases finding Title VII violations where an employer created or condoned a substantially discriminatory work environment, regardless of whether the complaining employees lost any tangible job benefits as a result of the discrimination” (pp 943-944).
In reaching this conclusion, the court drew heavily on Rogers v Equal Employment Opportunity Comm. (454 F2d 234, cert den 406 US 957), where the former Fifth Circuit held that a racially discriminatory and offensive work environment violated title VII. In Rogers, the court had recognized that: “Time was when employment discrimination tended to be viewed as a series of isolated and distinguishable events, manifesting itself, for example, in an employer’s practices of hiring, firing, and promoting. But today employment discrimination is a far more complex and pervasive phenomenon, as the nuances and subtleties of discriminatory employment practices are no longer con *717 fined to bread and butter issues” (p 238). Therefore, the Fifth Circuit explained, the term “terms, conditions or privileges of employment * * * is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination * * * One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers” (p 238). As the Bundy opinion {supra) demonstrates, numerous courts have followed the reasoning of Rogers and applied it to both race and sex discrimination cases.[8]
Thus, if racial slurs or sexual stereotyping through discriminatory dress requirements violate title VII by poisoning the work environment, then “sexual harassment, which injects the most demeaning sexual stereotypes into the general work environment and which always represents an intentional assault on an individual’s innermost privacy” must be illegal. (Bundy v Jackson, 641 F2d, at p 945.)
*718 Moreover, the D. C. Circuit wrote, since even indirect discrimination is illegal because it “may constitute a subtle scheme designed to create a working environment imbued with discrimination and directed ultimately at minority group employees” (quoting Rogers v Equal Employment Opportunity Comm., 454 F2d, at p 239), it is especially important to allow “women to sue to prevent sexual harassment without having to prove that they resisted the harassment and that their resistance caused them to lose tangible job benefits.” (Bundy v Jackson, 641 F2d, at p 945.) The court concluded that: “[U]nless we extend the Barnes holding [abolishing a female employee’s job in retaliation for resisting an employer’s sexual advances violates Title VII], an employer could sexually harass a female employee with impunity by carefully stopping short of firing the employee or taking any other tangible actions against her in response to her resistance” (p 945). This kind of. sexual harassment violates title VII because it “implicitly and effectively make[s] the employee’s endurance of sexual intimidation a ‘condition’ of her employment.” (Supra, at p 946.)
Significantly, the Bundy court (supra) held that while there was ample evidence that at least two other women employees had suffered harassment by Bundy’s employer, a finding of sex discrimination would be upheld even if Bundy had been the only victim, since Congress intended title VII to protect individuals against class-based prejudice. (Supra, at p 943.) There can be no question that the Administrative Code has the same thrust.
The Bundy case (supra) was recently cited with approval by the Appellate Division in Matter of Petties v New York State Dept. of Mental Retardation & Developmental Disabilities (93 AD2d 960). In Betties, the Appellate Division upheld a determination of the Commissioner of Mental Retardation and Developmental Disabilities terminating a supervisor for sexually harassing female employees. The harassment had consisted of physical touchings and engaging the women in sexually oriented conversations to which they objected. None of the victims was terminated. The court held that “[s]exual harassment in the work place is among the most offensive and demeaning torments an *719 employee can undergo” citing Bundy v Jackson (supra, p 961) and confirmed the decision to dismiss the supervisor. It is appropriate, therefore, to adopt and apply the Bundy reasoning to the case sub judice.
Many other Federal courts have followed Bundy (supra). A notable example is Henson v City of Dundee (682 F2d 897, supra). In that case, Henson and a coworker had been subjected to numerous harangues of demeaning sexual inquiries and vulgarities and requests for sexual relationships. The harassment ultimately led Henson to resign.
Relying heavily on Bundy and Rogers (supra), the Eleventh Circuit held that “under certain circumstances the creation of an offensive or hostile work environment due to sexual harassment can violate Title VII irrespective of whether the complainant suffers tangible job detriment.” (Henson v City of Dundee, 682 F2d, at p 901.) In so holding, the court explained: “Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets. A pattern of sexual harassment inflicted upon an employee because of her sex is a pattern of behavior that inflicts disparate treatment upon a member of one sex with respect to terms, conditions, or privileges of employment. There is no requirement that an employee subjected to such disparate treatment prove in addition that she has suffered tangible job detriment.” (Supra, at p 902.)[9]
In order to prove a case of sexual harassment, the Henson court (supra) required that five criteria be met: (1) the employee belongs to a protected group; (2) the employee was subject to unwelcome sexual harassment, which it defined as “ ‘sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature’ *720 * * * that the employee regard[s] as undesirable or offensive” (supra, p 903); (3) the harassment complained of was based upon sex; (4) the harassment complained of affected a “term, condition, or privilege” of employment; and (5) the employer was liable. A number of courts have adopted this test and applied it to find causes of action for sexual harassment under title VII. (See, e.g., Katz v Dole, 709 F2d 251; Phillips v Smalley Maintenance Servs., 711 F2d 1524; Cummings v Walsh Constr. Co., 561 F Supp 872; Coley v Consolidated Rail Corp., 561 F Supp 645.)
Of final instructive value are the Equal Employment Opportunity Commission (EEOC) guidelines promulgated in 1980. Their definition of sexual harassment is: “Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when * * * such conduct has the purpose or effect of unreasonably interfering with an individual’s work performance or creating an intimidating, hostile, or offensive working environment.” (29 CFR 1604.11 [a].)
These guidelines are the administrative interpretation of title VII (see Albemarle Paper Co. v Moody, 422 US 405, 431), and are “entitled to great deference” by the Federal courts. (Griggs v Duke Power Co., 401 US 424, 434.) Since they give further meaning to title VII’s prohibition of discrimination with respect to “terms, conditions, or privileges of employment” they may also be considered in interpreting the Administrative Code’s comparable phrase.
CONCLUSIONS OF LAW
After review of the relevant case law, I find the reasoning of Bundy, Henson (supra) and their progeny to be compelling and I adopt them as the law applicable to the Administrative Code. It would be irrational to interpret the Administrative Code’s phrase “terms, conditions or privileges of employment” so narrowly as to require a plaintiff to prove she was terminated or suffered adverse job consequences. Such a view would, as the Bundy court properly noted, permit employers to embarrass, degrade and violate their employees as long as they stop short of withholding tangible job benefits.
*721 While many victims of sexual harassment may be able to demonstrate tangible job-related losses, such as termination, loss of promotion or involuntary transfer, many others will suffer from less obvious but equally devastating effects such as inability to perform a job, loss of self-confidence, powerlessness, fear, anger, nervousness, decreased job satisfaction, and physical symptoms like headaches, nausea and weight change. (See, e.g., Rossein, Sex Discrimination and the Sexually Charged Work Environment, 9 NYU Rev of Law & Social Change, 271, 275-278.) This could not have been the intention of the City Council when it enacted section Bl-7.0 of the Administrative Code.
Rather, I hold that whenever an employer or supervisor requires workers to endure unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature, such as looks, touches, jokes, gestures, innuendos, epithets or propositions, and such conduct has the purpose or effect of unreasonably interfering with an individual’s work performance or creating an intimidating, hostile or offensive working environment, that person is committing sexual harassment in violation of the Administrative Code.
Thus, in order to make out a prima facie case of sexual harassment, in violation of section Bl-7.0 of the Administrative Code,[10] a person would have to show that (1) she/he belongs to a protected group; (2) she/he was subject to unwelcome sexual harassment as defined above; (3) the harassment complained of was based upon her/his membership in the protected class; and (4) the harassment complained of affected the “terms, conditions or privileges” of her/his employment.
Applying this law to the facts previously discussed, I find that petitioner Rudow is guilty of sexual harassment. Alvarez has proven that (1) she belongs to a protected group, i.e., women;* [11] (2) she was sexually harassed when *722 Rudow repeatedly touched her against her will; (3) she was the victim of this harassment because she was a woman; and (4) the harassment complained of affected the “terms, conditions or privileges” of her employment in that she felt so upset and degraded by the experience and so feared a reoccurrence that she was unable to return to work.[12] Alvarez also had to endure some of the other classic effects of sexual harassment, such as extreme nervousness, anger and loss of confidence.
There can be no question that the facts support a finding that Alvarez endured an atmosphere of sexual harassment, which was also experienced by the Donohues. But even if there were no such additional testimony, the fact would remain that Alvarez was made to suffer by Rudow’s behavior, due solely to her gender. A law against discrimination cannot tolerate such abuses of power. (See Bundy v Jackson, 641 F2d, at p 943.)
Accordingly, the petition is dismissed and the decision and order of the Commission is confirmed.

. Administrative Code of City of New York, ch I, tit B.

. Section Bl-9.0 of the Administrative Code permits judicial review of the Commission’s decisions and orders. That section states: “Any complainant, respondent or other person aggrieved by such order of the commission may obtain judicial review thereof, and the commission may obtain an order of court for its enforcement, in a proceeding as provided in this section. Such proceeding shall be brought in the supreme court * * * [T]he court shall have jurisdiction of the proceeding and of the questions determined therein, and shall have power * * * to make and enter upon the pleadings, testimony, and proceedings set forth in such transcript an order enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the commission * * * The findings of the commission as to the facts shall be conclusive if supported by sufficient evidence on the record considered as a whole.”

. This case was initiated on August 6, 1981, when complainant Alvarez filed a verified complaint with the Commission charging Rudow and his corporate employer with sex discrimination in the form of sexual harassment. After an investigation, the Commission issued a finding of probable cause. On May 5-7, the Commission held a hearing, which culminated in the decision and order which is the subject of this proceeding.

. The Court of Appeals has found that this section of the Administrative Code is “comparable in effect” to that of the State statute (Executive Law, § 298; Matter of Pace Coll, v Commission on Human Rights, 38 NY2d 28, 33). Accordingly, case law interpreting the latter is also instructive.

. In support of his argument, Rudow offers Alvarez’s timecard for the date of the final incident. However, this timecard was not introduced at the hearing and the court may not now consider it. The Court of Appeals has held that allowance may not be made in judicial review for information not contained in the record. (300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d, at p 181.) Even if the timecard were admissible at this stage, it would not affect the court’s determination that Alvarez’s and Sanchez’s testimony were a sufficient basis upon which the Commissioner could draw the conclusion he did.

. That section states, in relevant part:
“1. It shall be an unlawful discriminatory practice:
“(a) For an employer, because of the *** sex of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.”

. The pertinent provision of title VII is:
“It shall be an unlawful employment practice for an employer —
“(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual’s * * * sex”. (US Code, tit 42, § 2000e-2, subd [a], par [1].)
The wording of title VII is substantially the same as section Bl-7.0 of the Administrative Code (infra, n 6). While the Federal courts’ interpretation of title VII are not binding on the State courts’ view of local antidiscrimination statutes, they are nevertheless instructive. (Brooklyn Union Gas Co. v State Human Rights Appeal Bd., 41 NY2d 84, 86, n 1.)

. The Bundy court’s research revealed the following cases: “Carroll v. Talman Federal Savings & Loan Ass’n, 604 F.2d 1028, 1032-1033 & n.13 (7th Cir. 1979), [cert den 445 US 929] (forcing female bank employees to wear uniforms while allowing males to wear own suits violates Title VII by perpetuating demeaning sexual stereotypes; ‘terms and conditions of employment’ mean more than tangible compensation and benefits); Cariddi v. Kansas City Chiefs Football Club, Inc., 568 F.2d 87 (8th Cir. 1977) (though employee could only prove isolated incidents, a pattern of offensive ethnic slurs would violate his Title VII rights); Firefighters Institute for Racial Equality v. City of St. Louis, 549 F.2d 506, 514-515 (8th Cir.), cert, denied, 434 U.S. 819, 98 S.Ct. 60,54 L.Ed.2d 76 (1977) (segregated employee eating clubs condoned — though not organized or regulated — by employer violate Title VII by creating discriminatory work environment); Gray v. Greyhound Lines, East, 178 U.S.App D.C. 91, 545 F.2d 169, 176 (D.C. Cir. 1976) (pattern of racial slurs violates Title VII rights to nondiscriminatory' environment); United States v. City of Buffalo, 457 F.Supp. 612, 631-635 (W.D. N.Y. 1978) (black employees entitled to work environment free of racial abuse and insult); Compston v. Borden, Inc., 424 F.Supp. 157 (S.D. Ohio 1976) (demeaning religious slurs by supervisor violate Title VII); Steadman v. Hundley, 421 F.Supp. 53, 57 (N.D. Ill. 1976) (racial slurs may lead to Title VII violation); cf. Harrington v. Vandalia-Butler Board of Educ., 585 F.2d 192, 194 n.3 (6th Cir. 1978), cert, denied, 441 U.S. 932, 99 S.Ct. 2053, 60 L.Ed.2d 660 (1979) (giving female physical education teachers inferior locker and shower facilities is illegal discrimination; Title VII reaches ‘actual working conditions,’ not just equal opportunity for employment); Waters v. Heublein, Inc., 547 F.2d 466 (9th Cir.), cert. denied, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1100 (1977) (white plaintiff has standing to sue employer who discriminates against blacks, since she has statutory right to work environment free of racial prejudice); Swint v. Pullman-Standard, 539 F.2d 77 (5th Cir. 1976) (discriminatory job assignments violate Title VII even where no discrimination in salary; Title VII claimant need not prove tangible economic harm).” (Bundy v Jackson, 641 F2d, at pp 944-945; see, also, Equal Employment Opportunity Comm. v Sage Realty Corp., 507 F Supp 599 [requirement that lobby attendant wear sexually revealing uniform causing sexual harassment by public violates title VII].)

. The court went on to state: “The problem of sexual harassment in the workplace apparently is widespread. It was recently the focus of hearings before the Senate Committee on Labor and Human Resources. At those hearings, the acting chairman of the Equal Employment Opportunity Commission cited the rising number of charges filed with the agency that complained of sexual harassment. See Sex Discrimination in the Workplace, 1981, Hearings Before the Senate Comm, on Labor and Human Resources, 97th Cong., 1st Sess. 336, 342 (1981) (statement of J. Clay Smith, Jr., acting chairman of E.E.O.C.); 106 L.R.R. News & Background Inf. 333-35 (April 27,1981). See also U.S. Merit Systems Protection Board, Sexual Harassment in the Federal Workplace: Is it a Problem? (1981); 45 Fed. Reg. 25,024 (April 11, 1980) (commentary accompanying E.E.O.C. interim guidelines on sexual harassment)” (p 902, n 5).

. Since no corporate liability is sought in this case, there is no need to reach the question of what a prima facie case would require in that regard.

. Under some circumstances lesbians and gay men are also members of a protected group. Executive order No. 4 of January 23,1978 prohibits “discrimination by any City administration, agency, department, commission or other official entity, or any official representative thereof, on account of sexual orientation or affectional preference in any matter of hiring or employment * * * or any other matter whatsoever.” Thus, antigay or homophobic remarks or actions taken by any city agency or representative as defined supra, similar to those described in the context above, may also constitute prohibited discrimination within the jurisdiction of the Commission.

. While the parties have briefed the issue of whether the circumstances of Alvarez’s leaving her job amounted to constructive discharge, there is no need to reach this issue as the claim for damages has already been resolved.