*796 OPINION OF THE COURT
Lorraine Miller, J.
Human beings of all ages appear to have a need and propensity to engage in pranks, practical jokes, taunting and teasing and stunts under the guise of humor. When it is goodnatured and harmless it may relieve the tensions imposed by the pressures of daily life. However, “humor is a fragile thing.”[1] When it is actually what Freud labeled “masked aggression,” directed at an individual because of gender, race or age, it is prohibited under the sense of fairness, decency and justice which prevails today. Behavior which transcends or was shrugged off as mere annoyance, to be suffered in silence by the recipient, is now condemned and banned by our Federal, State and local laws.
The unanimous verdicts rendered in favor of plaintiff, Maureen McIntyre (plaintiff), on June 3 and June 4, 1997, on her claims of sexual harassment, retaliation and intentional infliction of emotional distress and the award by the jury of $6.6 million in damages ($5 million of which were punitive damages) reflect the abhorrence of such behavior by contemporary society. Defendant, Manhattan Ford, Lincoln-Mercury, Inc. (defendant), now moves herein for judgment, posttrial, setting aside the verdicts as a matter of law, pursuant to CPLR 4404 (a) or, alternatively, for a new trial on all issues; or to set aside or substantially remit the jury’s compensatory and punitive damage awards.
I. FACTUAL BACKGROUND
Plaintiff, a woman in her mid-thirties, had worked as a service representative in the garages of various automobile dealers since 1982. In an industry dominated by men, she held a unique position when hired by defendant on July 21, 1991. Her duties were to confer with customers who brought their automobiles for repair, warranty claims, maintenance or inspection. Plaintiff was the only female among the five service representatives on the second floor of the defendant’s garage in their eight-story premises at 11th Avenue and West 57th Street. The few other women employed by defendant, among its 165 employees, were engaged in clerical and accounting duties. Plaintiff was earning $32,000 annually plus various benefits, until her sudden termination on December 17, 1993. The testimony, even by defendant’s witnesses, demonstrated *797 that she did her job well and had a good relationship with defendant’s customers.
Defendant was incorporated in Delaware in 1981. However, Ford Motor Company (Ford) owns 100% of the stock and holds three of the five seats on defendant’s board of directors. This large dealership is Ford’s only Manhattan location. A complex financial arrangement exists between them whereby Ford “assists” the dealership in the payment of certain obligations.
Since its incorporation, defendant’s president has been Albert J. Vitarelli (Vitarelli). The head of the entire service and parts department, which occupied most of the eight floors, was Steven Czerniuk (Czerniuk). All the service representatives were therefore under his jurisdiction. Their immediate supervisors were John Fingar (Fingar) and Bob Tassie (Tassie). Because Czerniuk, Fingar and the fourth-floor supervisor, George Vurckio (Vurckio), spent so much time together in incidents involving the plaintiff, she called them the “Three Musketeers” during the trial.
A. Plaintiff’s Claim of Hostile Work Environment
According to plaintiff, the conduct and words upon which her claims are predicated began when Czerniuk was promoted in November 1991 to the important position of parts and service director of the dealership. Shortly after his promotion, Czerniuk asked plaintiff in the lunchroom if she was in love with her boyfriend. Czerniuk indicated that he and his wife were “into different things and led separate lives.” Plaintiff told Czerniuk that she loved her boyfriend and asked that he refrain from inquiring about her personal affairs.
From this time forward, plaintiff testified that the triumvirate, Czerniuk, Fingar and Vurckio, began a pattern of intimidation, abuse, humiliation and ridicule through the use of unwelcome and improper language and conduct, often of a sexually explicit nature. Moreover, plaintiff complained of their failure, as supervisors, to protect her from similar conduct by other employees. According to plaintiff, the incidents of abuse occurred very frequently (some were daily) until the day she was terminated. Defendant denied that plaintiff was subjected to an abusive and hostile work environment and further claimed that she was “fired” for insubordination.
Plaintiff noted that from the moment she rejected Czerniuk’s advances he began to use foul and abusive language towards her. Every sentence would include the word “fuck” or other similar language. Frequently, plaintiff was admonished by Cz *798 ernuik “to do what she was told,” that “he was the boss” and “you do what the fuck I tell you.”
In May 1993, plaintiffs uniform pants no longer fit due to pregnancy. She confided her condition to Czerniuk, requested it be kept secret and also requested to wear her own clothes. According to plaintiff, Czerniuk responded “I knew you were pregnant because your tits were larger” and within 10 minutes another worker congratulated her on being pregnant.
Additionally, plaintiff testified to the following incidents:
After missing several days of work due to a miscarriage, Czerniuk, Fingar and Vurckio laughingly said to her that she had used the miscarriage as an excuse to miss work.
While reaching for a customer’s file from on top of a file cabinet in Czerniuk’s office, he stated to Fingar and Vurckio, “She has breast implants. Look how big her tits are.”
After a customer, with whom plaintiff had been conferring about his car, had departed, Czerniuk approached her with Fingar and Vurckio, and asked her “if she liked that man.” Plaintiff told Czerniuk that she thought the customer was very nice and he said “Oh,. I noticed that because you were on your knees for him.”
On another occasion, Czerniuk approached and asked her if she “had ever done a black man.”
Vurckio, often in the presence of Czerniuk and Fingar, referred to her as a “bitch on a broom,” or would address her with “hello, bitch” and “good morning, bitch.” Vurckio admitted that he had called plaintiff a “bitch on a broom,” and conceded that it was a sexist statement.
That on a daily basis a broom would be left near her desk.
That during a disagreement with plaintiff, Fingar admittedly said to her “suck my dick.”
That on at least five occasions while using the second-floor ladies room, Czerniuk would bang on the door until she opened it.
Shortly before her discharge, Czerniuk told her that she was not to accept any “tips” from customers during Christmas time. The other service writers reported no similar prohibition.
That the words “blow me” were carved into her desk. When she had shown it to Czerniuk, he said, “What’s the big deal? Scrape it off.” Indeed, she had to personally remove the offensive words. It was never determined who carved the words and that, other than questioning the security guard, no investigation was undertaken.
*799 That a sign containing the words “flush me” was taped on her chair. Plaintiff reported the incident to Czerniuk who once again told her, “What’s the big deal?” Again, no effort was made by management to ascertain the perpetrator of this incident.
That a mechanic threw a box of rotors at her injuring her foot after she asked him when a car he was working on would be ready. Once again Czerniuk told her that he didn’t think it was necessary to do anything about it.
That after learning plaintiff made complaints about him, an employee named Robert Lusko, Jr., the son of the Ford regional sales manager, who was described by one witness as a “live wire,” attacked plaintiff grabbing her around the throat and neck. Although he was fired, no one ever investigated the incident and Mr. Lusko was on the premises several times after his termination.
Based upon Czerniuk’s own participation, as well as his refusal to reprimand and discipline workers under his jurisdiction, plaintiff testified that she went to see Vitarelli, left several messages for him, but he never responded. Vitarelli denied that his managers had ever informed him about any of these incidents other than the one involving Lusko. His posture throughout the trial about these events as well as his behavior in the presence of the. jury was cavalier and evasive.
B. Defendant’s Policy Against Sexual Harassment
During the trial, an issue arose as to whether defendant had any policy regarding sexual harassment upon which employees could rely. Initially, Vitarelli testified that defendant had no such policy in effect until six months prior to the trial when an employee handbook was finally created containing a written policy regarding sexual harassment.[2] After a luncheon recess, Vitarelli retracted his prior testimony stating that the defendant did have a verbal policy against sexual harassment during the time plaintiff was employed. Vitarelli called it a policy of “fairness” which eventually became codified in the written policy not yet approved by Ford.
Vitarelli claimed after the luncheon recess that he implemented the oral policy by conveying it to his managers and *800 had instructed them to speak with their subordinates. Vitarelli also stated that he “managed” by walking around and had an “open door” policy that any employee could come to him at any time to complain about sexual harassment. If he was not present, he stated that Czerniuk would then become the person an employee could go to to make complaints about sexual harassment.
Both Czerniuk and Vurckio testified that they had held meetings with the employees they supervised to discuss defendant’s oral policy against sexual harassment. However, both the plaintiff and Sharon Hall (Hall), who had been working for the defendant for 10 years, testified that they had never been informed of any policy, verbal or otherwise, regarding sexual harassment. Hall further stated that she had never heard of Vitarelli’s “open door” policy.
C. Plaintiff’s Emotional State
Plaintiff testified that she suffered severe emotional trauma due to the abusive conduct of Czerniuk and the others. Throughout her testimony, plaintiff continually stated that while she was at work she was made to feel humiliated, intimidated and insignificant. At one point, plaintiff testified that she felt like she was being treated like “an animal” and not a human being.
Due to the offensive nature of her work environment and her inability to cope with it, plaintiff had consulted a psychologist, Dr. Eric Margenau, whom she visited 21 times between June 1993 and March 1994. She testified that she had to discontinue treatment when she could no longer afford the fees after she was terminated.
According to the testimony of Dr. Margenau, “work was central to [the plaintiff’s] life,” both financially and esmotionally, and that she was torn between the job’s importance in her life and having to cope with the behavior that she was subjected to. This caused plaintiff to be “confused, distraught and anxiety ridden.” After her termination, Dr. Margenau testified that plaintiff was less distraught because she was no longer in an abusive environment. However, with regard to her future, Dr. Margenau prophesied that plaintiff would have a difficult time because she would be apprehensive about a reoccurrence at any new job and would suffer from anxiety about her performance.
*801 II. PROCEDURAL/LEGAL HISTORY
On June 28, 1994, plaintiff filed a charge of sexual discrimination and retaliation with the New York State Division of Human Rights. Plaintiff then initiated this lawsuit in October 1994 by filing a summons and verified complaint which alleged, inter alia, sexual harassment (predicated upon claims of both hostile work environment and quid pro quo), retaliation and intentional infliction of emotional distress. The employment discrimination claims were brought pursuant to the New York State Human Rights Law (Executive Law § 296 [1] [a]) and the New York City Human Rights Law (Administrative Code of City of NY § 8-107 [1] [a]; § 8-502). Defendant thereafter interposed an answer in which it denied the allegations.
On May 23, 1997, the case was assigned to this court for a trial by jury. At the close of plaintiffs case, the court dismissed her claim of quid pro quo sexual harassment and reserved decision as to the other claims which were given to the jury on June 3, 1997.
The jury, thereafter, returned a unanimous verdict in favor of the plaintiff on all three of her claims and awarded her $1.6 million in compensatory damages. On June 4, 1997, a hearing was held regarding punitive damages and, after deliberation, the jury unanimously awarded plaintiff $5 million.
III. DISCUSSION
Defendant now moves to set aside the jury’s verdict pursuant to CPLR 4404 (a), or in the alternative, to grant defendant a new trial on all issues; or to reduce the amount of the jury’s compensatory and punitive damages award. Pursuant to CPLR 4404 (a), the court, in its discretion, may “set aside a verdict or any judgment entered thereon and direct that judgment be entered in favor of a party entitled to judgment as a matter of law or it may order a new trial” if it concludes that “there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented” (see, Cohen v Hallmark Cards, 45 NY2d 492, 499 [1978]; see also, Mirand v City of New York, 84 NY2d 44 [1984]; Brotman v Biegeleisen, 192 AD2d 410 [1st Dept 1993]; Siegel, NY Prac § 405 [2d ed 1991]).
The decision to nullify a jury’s verdict largely turns on the common sense derived from “ ‘an application of that professional judgment gleaned from the Judge’s background and experience as a student, practitioner and Judge’ ” (see, Annun *802 ziata v Colasanti, 126 AD2d 75, 80 [1st Dept 1987]; see also, Nicastro v Park, 113 AD2d 129 [2d Dept 1985]). Although the court’s discretion is broad, it must exercise such discretion with considerable caution, “for in the absence of indications that substantial justice has not been done, a successful litigant is entitled to the benefits of a favorable jury verdict” (see, Salazar v Fisher, 147 AD2d 470, 471 [2d Dept 1989]).
A. Plaintiffs Claim of Hostile Work Environment
As hereinafter stated, both New York State and New York City Human Rights Laws (Executive Law § 290 et seq.; Administrative Code § 8-101 et seq., respectively) make it unlawful for an employer in its employment practices to discriminate against any person because of age, race, creed, color, sex, etc. (Executive Law § 296 [1] [a]; Administrative Code § 8-107 [1] [a]).[3] Under the law, sexual harassment constitutes a form of discrimination under circumstances in which a person is subjected to a “hostile work environment” based on their gender (see, Meritor Sav. Bank v Vinson, 477 US 57 [1986]; Kotcher v Rosa & Sullivan Appliance Ctr., 957 F2d 59 [2d Cir 1992]).
A “hostile work environment” exists when, as judged by a reasonable person, it “is permeated with ‘discriminatory intimidation, ridicule, and insult’ * * * that is ‘sufficiently severe or pervasive to alter the conditions of the [plaintiffs] employment’ ” (see, Harris v Forklift Sys., 510 US 17, 21 [1993], quoting Meritor Sav. Bank v Vinson, supra; see also, Karibian v Columbia Univ., 14 F3d 773 [2d Cir 1994]). In order to make out a prima facie case, a plaintiff must prove (1) that she is a member of a protected class; (2) that the conduct or words upon which her claim of sexual harassment is predicated were unwelcome; (3) that the conduct or words were prompted simply because of her gender; (4) that the conduct or words created a hostile work environment which affected a term, condition or privilege of her employment; and (5) that the defendant is liable for such conduct (see, Trotta v Mobil Oil Corp., 788 F Supp 1336 [SD NY 1992]; Danna v New York Tel. Co., 752 F Supp 594 [SD NY 1990]; see also, Kotcher v Rosa & Sullivan Appliance Ctr., supra).
*803 Whether conduct or words are unwelcome and whether a workplace should be viewed as hostile or abusive can only be determined by considering the totality of the circumstances (see, Harris v Forklift Sys., supra; Trotta v Mobil Oil Corp., supra; Yaba v Roosevelt, 961 F Supp 611 [SD NY 1997]). In determining whether a plaintiff was subjected to a hostile work environment a court may consider the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating or a mere offensive utterance and whether it unreasonably interfered with the plaintiff’s work performance (see, Harris v Forklift Sys., supra). While plaintiff need not show that the offensive conduct or words affected her psychological well-being in order for her to recover, it may be a factor in determining whether the work environment was hostile or abusive (see, Rivera v Prudential Ins. Co., 1996 US LEXIS 16337, *27 [ND NY, Oct. 21, 1996, McAvoy, J.], citing Harris v Forklift Sys., supra). Moreover, a hostile work environment may exist although the plaintiff did not suffer a tangible economic loss (see, Danna v New York Tel. Co., supra).
An employer is liable for a hostile work environment created by its employees if the employer acquiesced in the discriminatory conduct or subsequently condoned it (see, Matter of State Div. of Human Rights [Green] v St. Elizabeth’s Hosp., 66 NY2d 684 [1985]; Goering v NYNEX Information Resources Co., 209 AD2d 834 [3d Dept 1994]). Condonation may be established by knowledge of the discriminatory conduct acquired after the fact, combined with insufficient investigation and/or insufficient corrective action (see, Matter of Father Belle Community Ctr. v New York State Div. of Human Rights, 221 AD2d 44 [4th Dept 1996]). Moreover, where acts of discrimination are perpetrated by a high-level managerial employee, such as Czerniuk, Fingar and Vurckio, the employer may be liable even without any showing of condonation or acquiescence (supra).
Based on the testimony and exhibits presented at this trial the court finds no reason to disturb the jury’s verdict as to plaintiff’s claim that she was subjected to a hostile work environment based on her gender. Plaintiff’s evidence was sufficient to make out all of the elements necessary to establish a prima facie case and more. Comments were made regarding her breasts, she was subjected to sexually explicit jokes and names and the constant use of vulgar and derogatory language. On two occasions she was physically assaulted. Indeed, Fingar admitted that he said “suck my dick” to plaintiff and Vurckio admitted that he called her a “bitch”; a word with admittedly sexist connotations.
*804 What can be considered the most egregious incident of all involved Czerniuk’s humiliating comment and subsequent laughter regarding plaintiffs miscarriage. To find humor in the misfortune of others, especially where a loss of life is involved, exemplifies the malevolent nature of plaintiffs harassers and the futility that plaintiff experienced in attempting to put an end to their torment (see, e.g., Torres v Pisano, 116 F3d 625, 627 [2d Cir 1997] [a reasonable woman would find her work environment altered and abusive where her own supervisor referred to her as a “dumb cunt”, ridiculed her pregnancy, commented on her anatomy, etc.]).
In addition to the approximately 17 specific incidents plaintiff detailed, she testified that being called a “bitch on a broom,” Czerniuk’s excessive use of profanity in her presence and other such incidents occurred on almost a daily basis. All of these allegations of abuse are sufficient to support a finding by the jury that plaintiff was subjected to “pervasive harassment” (see, Dey v Colt Constr. & Dev. Co., 28 F3d 1446 [7th Cir 1994]; Fernot v Crafts Inn, 895 F Supp 668 [D Vt 1995]).
Moreover, sufficient evidence was presented to the jury to find a hostile work environment existed because “once an employer learns of claims of discriminatory acts, it cannot rest idly on hopes that such acts will not be repeated, whether by the same employee or any other” (see, Watts v New York City Police Dept., 724 F Supp 99, 108 [SD NY 1989]). Here, plaintiff made numerous complaints to Czerniuk about his conduct and the conduct of his comrades. However, defendant failed to investigate plaintiffs complaints, take disciplinary action or “dispel [the] workplace hostility” by letting it be known that harassment would not be tolerated (supra, at 108; see also, Snell v Suffolk County, 782 F2d 1094 [2d Cir 1986]). This the Human Rights Law does not permit (Watts v New York City Police Dept., at 108, citing DeGrace v Rumsfeld, 614 F2d 796 [1st Cir 1980]). Indeed, Czerniuk, one of defendant’s highest ranking supervisors, was a principal in the barnyard-type cruelty!
In support of its motion, the defendant makes several arguments, all of which are lacking in merit. First, defendant contends that the verdict should be set aside because plaintiffs own behavior established that she did not find the conduct or words “unwelcome”. Although plaintiff admitted that she was no “angel”, her behavior does not justify, condone or exonerate the harassing and abusive behavior directed at her because of her gender (Carr v Allison Gas Turbine Div., Gen. Motors Corp., *805 32 F3d 1007; Danna v New York Tel. Co., 752 F Supp 594, supra; see also, Price Waterhouse v Hopkins, 490 US 228 [1989]).
In a case that closely mirrors the one tried before this court, a plaintiff was hired by the defendant, a division of General Motors, to work as a tinsmith apprentice in an all male workplace (see, Carr v Allison Gas Turbine Div., Gen. Motors Corp., supra). Until she was forced to quit after four years, the plaintiff was subjected to sexually harassing conduct and words (i.e., her male co-workers called her a “cunt” and painted the word on her toolbox, would undress in front of her, would hang pornographic pictures, etc.) which she continually complained about to no avail. In response to plaintiffs claim that she was subjected to a hostile work environment, the defendant argued that the plaintiff, by her own use of vulgar language and her confrontational behavior, had “invited” (at 1010) the abusive actions of her co-workers.
In reversing the District Judge (who had found for the defendant after trial on the ground that the conduct of plaintiffs coworkers was not unwelcome), the Seventh Circuit stated that (supra, at 1011): “The asymmetry of positions must be considered. She was one woman; they were many men * * * We have trouble imagining a situation in which male factory workers sexually harass a lone female in self-defense as it were; yet that at root is [defendant’s] characterization of what happened here.” Therefore, plaintiffs alleged “ ‘unladylike’ ” conduct, done in an attempt to be “ ‘one of the boys’ ”, cannot be “compared to those of the men and used to justify their conduct and exonerate their employer” (supra, at 1011; see also, Danna v New York Tel. Co., supra [plaintiffs use of foul language and writing graffiti did not waive her right to legal protection from sexually harassing behavior]).
In Price Waterhouse (supra, at 258), the Supreme Court addressed this issue by stating that “[a court’s] perception of [plaintiffs] character is irrelevant. [The court] sits not to determine whether [plaintiff] is nice, but to decide whether [her employer] reacted negatively to her personality because she is a woman.” Therefore, plaintiffs use of profanity is irrelevant to the issue of whether she was subjected to a hostile work environment by the conduct of Czerniuk and other employees (see, Danna v New York Tel. Co., supra).
Second, defendant contends that the incidents were not of a sexual nature and therefore cannot support a verdict in plaintiffs favor. Defendant’s position is contrary to law. As *806 held by both Federal and State courts, the conduct or words upon which plaintiffs claim of discrimination is predicated need not be of a sexual nature in order to create a hostile work environment as long as the conduct or words are prompted because of the employee’s gender (see, Rudow v New York City Commn. on Human Rights, 123 Misc 2d 709 [Sup Ct 1984]; Equal Empl. Opportunity Commn. v Sam & Sons Produce Co., 872 F Supp 29 [WD NY 1994]; see also, Andrews v City of Philadelphia, 895 F2d 1469 [3d Cir 1990]; Hall v Gus Constr. Co., 842 F2d 1010 [8th Cir 1988]). In any event, the references to her anatomical parts were of a sexual nature and defendant’s contentions are blatantly spurious.
Clearly, the jury found that the conduct and words described by plaintiff “crossed the line that separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing” (see, Carr v Allison Gas Turbine Div., Gen. Motors Corp., at 1010, supra). These incidents created a work environment that was “poisoned” by a pervasive onslaught of abusive conduct directed at the plaintiff (see, Danna v New York Tel. Co., at 611, supra) from which, due to the fact that her supervisors were the prime offenders and the existence of an alleged oral sexual harassment policy which was so ephemeral as to be nonexistent, she had no meaningful way to escape except to resign from a well-paying job which she loved (see, Kotcher v Rosa & Sullivan Appliance Ctr., 957 F2d 59, supra; Danna v New York Tel. Co., supra; Torres v Pisano, supra). Indeed, both Vitarelli and Czerniuk admitted before the jury that if the incidents described by plaintiff were true, they would constitute acts of sexual harassment for which disciplinary action should have been taken. The jury’s verdict, therefore, reflected both a factual and credibility determination in plaintiffs favor which was rationally based on the evidence before it (see, Cohen v Hallmark Cards, 45 NY2d 492, supra). Accordingly, the portion of defendant’s motion seeking to set aside the jury’s verdict as to plaintiffs claim of sexual harassment is denied.[4]
IV. CONCLUSION
While Vitarelli professed that he maintained a paternalistic “hands on” approach to management by walking around the *807 shop floor and by maintaining an “open door” policy, he was strangely absent each time a crisis arose leaving Czerniuk in charge. Additionally, as a member of defendant’s board of directors and as its president, Vitarelli’s cavalier and contemptuous attitude toward plaintiffs allegations was exhibited by the manner in which he had directed the “investigation” by Czerniuk into plaintiffs allegations. It was a prime example of the adage about the “fox guarding the henhouse.” Moreover, his conduct and amused facial expressions before the jury throughout the trial, both on the stand and as a spectator in this small courtroom, demonstrated his utter failure to appreciate the obligations of an employer to safeguard the rights of all employees to work in an atmosphere free from discrimination of any kind. As this court observed Vitarelli’s behavior during the trial it was reminded of the repeated admonitions Molly gave to Fibber many years ago when she cautioned him, “T’aint funny Magee!”[5]
Accordingly, it is ordered that defendant’s motion to set aside the verdict rendered in favor of plaintiff as to liability on her claims of sexual harassment, retaliation and intentional infliction of emotional distress, or in the alternative for a new trial, pursuant to CPLR 4404 (a), is hereby denied; and it is further ordered that defendant’s motion for a new trial to determine the amount of both compensatory and punitive damages is granted and the verdict is set aside unless the plaintiff agrees to accept $650,000 for emotional pain and suffering, $53,000 for lost wages and $3,000,000 in punitive damages, or a total of $3,703,000. Plaintiff must notify the court of its decision in this regard within 20 days from receipt of a copy of this decision with notice of entry.

. Palmer, Taking Humor Seriously (Routledge 1994).

. Although the handbook allegedly contained a written sexual harassment policy, there was some confusion as to whether the handbook had actually been distributed to defendant’s employees at the time of trial because Ford had retained the right to approve but had not approved the final draft of the policy.

. Throughout this decision this court will refer to Federal case law as it has been noted that “New York courts rely on federal law when determining claims under the New York Human Rights Law” (see, Reed v Lawrence & Co., 95 F3d 1170, 1177 [2d Cir 1996]; Matter of Miller Brewing Co. v State Div. of Human Rights, 66 NY2d 937 [1985]).

. For the complete text of this decision in which the court also upheld the jury’s findings of retaliation and intentional infliction of emotional distress but necessarily reduced plaintiffs compensatory damages award to $703,000 and necessarily reduced plaintiffs punitive damages award to $3,000,000, see McIntyre v Manhattan Ford, Lincoln-Mercury (NYLJ, Sept. 11, 1997, at 25, col 3).

. Taken from the radio program “Fibber Magee and Molly”.