**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,**
Plaintiff,

v.

**A. SAM & SONS PRODUCE COMPANY, INC., Defendant.**

No. 91–CV–0749E(M).

United States District Court,
W.D. New York.

Aug. 2, 1994.

Nancy Dean Edmonds, E.E.O.C., New York City, for plaintiff.

John A. Galeziowski, Hamburg, NY, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW and ORDER

ELFVIN, District Judge.

The Equal Employment Opportunity Commission ("the EEOC") brought this action, pursuant to its authority under 42 U.S.C. § 2000e–5(f)(1), alleging that the defendant ("A. Sam") sexually harassed its employees Brenda Borello[1] and Linda Titus and then discharged them in retaliation for their complaining of such, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Specifically, the EEOC alleges that A. Sam's vice-president Charles Sam ("Charles") directed at Borello and Titus language that was so abusive and demeaning as to create an actionable "hostile work environment." A bench trial was held in February of 1993 after which the parties exchanged and filed proposed findings of fact and conclusions of law and responses thereto and thereafter presented oral arguments.

A. Sam is a farmer, packer and distributor of produce. During the relevant period Essau Sam ("Essau") was its president, his sister Helen Sam ("Helen") was its office manager and corporate secretary and Charles, Essau's son, was its vice president.[2] A. Sam had no written sexual harassment

policy or grievance procedure (Joint Stipulation at ¶¶ 27, 28).

A. Sam hired Borello July 4, 1987 as a full-time bookkeeper. Her duties included calculating taxes for A. Sam's trucks, handling accounts payable, converting the accounts payable information from paper documents to computer files and acting occasionally as a receptionist. Titus was hired in November 1986 for a temporary position selling fruit baskets. In January 1987 A. Sam gave her a permanent position converting the accounts receivable information to computer files, performing secretarial work and selling produce. Both Titus and Borello were supervised by Helen.

In 1983, before Borello or Titus was hired, Charles referred to A. Sam's office female employee Tammy Mowrey as a "fucking slut" (Transcript ["Tr."] at 110), compelling her to quit immediately thereafter and making her feel demeaned (Tr. at 113) and emotionally upset (Tr. at 113, 118). After Mowrey had returned home and told her father of this comment, he confronted Helen about Charles's behavior. She apologized and assured him that she would give Mowrey a good reference. (Tr. at 118). During Borello's and Titus's tenure, A. Sam's dispatch office worker Mike Albach overheard Charles state on the telephone "that all the girls are whores and all they're good for is * * * fucking." (Tr. at 126).

Borello's work required her to have intermittent contact with Charles—*e.g.*, delivering telephone messages to him, getting authorizations from him for delivery slips and seeing him when he passed through her office. (Tr. at 42). In addition to Charles's sporadic yelling and screaming at Borello during her employment (Tr. at 73), a more serious series of incidents began late in 1987. On or about December 4th, Borello had left on Charles's desk a delivery slip for his authorization. The following morning she found it on her desk, Charles having written on it "whore what is the amount??" *See* Plaintiff's Exh. 12.[3] Borello immediately apprised Helen

---

1. Now Brenda Simmons–Olson.

2. Charles became A. Sam's president in December 1989.

3. Borello recognized the handwriting because she had seen many examples of it during her previous five months of employment. Charles, when shown Plaintiff's Exh. 12 and asked whether it was his handwriting, stated "I don't think

and Essau of this,[4] and then went to the bathroom and cried. Further, she contemporaneously noted, in writing, this incident. Later that day Borello overheard a loud argument between Charles and Helen in which he yelled that all the girls in the office were "whores and all [they] knew how to do [was] fuck." This upset Borello further.

Later (during the next week) Charles, while walking through Borello's office and in her presence, stated "nothing but a whore, nothing but a little whore, just a whore."[5] (Tr. at 50). About a week thereafter, while Borello was at the time clock waiting to punch in, Charles told her "why don't you stare at the time clock a little bit more ya whore."[6] These incidents upset Borello, making her feel belittled and demeaned. She again apprised Helen of the incidents, stating after the time clock incident that "enough was enough" and that Charles's conduct had to stop. Helen agreed that Charles's conduct was objectionable and assured Borello that she would talk to Charles about his conduct. Borello also told Essau of Charles's conduct, who also assured her he would talk to Charles.[7]

About a week before Borello was dismissed (on or about December 29th) she telephoned Charles to advise him that he had messages. In response, Charles shouted "go fuck yourself" and hung up. Titus, who at the time was sitting very close to Borello, overheard this exchange. (Tr. at 98). Borello again confronted Helen and told her of this incident stating "enough is enough" and that "if [Helen] didn't do something about it, [she] was going to do something about it because [she] shouldn't have to put up with this." (Tr. at 56). Helen then called Titus into her office, at Borello's request, and Titus verified what had occurred (Titus's recollection, however, was that Charles had called Borello a "whore"). Borello also told Essau of Charles's conduct and warned him that if he did not do "something" about Charles's behavior, she would.

Despite their assurances to Borello that they would, neither Helen nor Essau ever confronted Charles about his behavior toward Borello.

Titus also had intermittent contact with Charles during her employment. She claims to have overheard, through the walls of his office, Charles call unspecified persons "whores" on three occasions and claims to have overheard Charles say "what good are

---

it's not my handwriting." (Tr. at 278). This Court does not credit this apparent denial. Charles admitted that the document concerned the type of document (forklift repairs) for which he was responsible. (Tr. at 279). Further, he admitted that the handwriting in the top three columns of Plaintiff's Exhs. 10 and 11 was his, examination of which reveals a striking resemblance to that of Plaintiff's Exh. 12 (compare especially "S" and "A" in the second columns of Plaintiff's Exhs. 10 and 11 with the same letters in Plaintiff's Exh. 12). Additionally, Charles admitted that "whore" was a word he often used (albeit with customers). (Tr. at 298).

4. The defendant argues that Helen denies that Borello complained to her about the note, citing her testimony at page 207 of the transcript, but the record reveals she was never asked directly about it. Essau did directly deny that Borello showed him the note, but his trial and deposition testimony reveal that his memory of the relevant period is spotty. (*See* Tr. at 263–267).

5. Charles, when asked if he remembered ever having called an employee a whore, stated "no, I can't even picture it." Regardless of what he remembers, this Court credits Borello's testimony.

6. The defendant argues that Borello's testimony concerning these two incidents is incredible because Charles denied them and because, unlike the aforementioned delivery slip incident and a subsequent telephone incident (see below), Borello made no contemporaneous notes of them. This Court finds such arguments unpersuasive. Given Charles's denials concerning the delivery slip incident where the evidence was compelling that he had written the phrase at issue and given his vague recollection of the period generally, it is his testimony that this Court finds incredible. Further, although Borello did not contemporaneously note the telephone incident, she did mention it in her nearly contemporaneous letter to the EEOC in February 1988. *See* Defendant's Exh. 7.

7. Helen does not "recall" any instances wherein Borello complained about being called a whore, but does admit that Borello complained at least ten times to her about Charles's "hollering." (Tr. at 206). She also admits that Borello had complained that Charles "had called her [Borello] something profane over the telephone." (*Id.*) Essau remembers only that Borello complained about Charles's "hollering." (Tr. at 262). This Court credits Borello's testimony.

Helen's whores in the office." Further, Borello showed Titus the delivery slip with "whore what is the amount??" written on it, and Titus heard the aforementioned telephone exchange between Charles and Borello. However, Titus admitted that Charles had never called her a whore,[8] and there is no persuasive evidence in the record that he directed sexually derogatory language at her. Titus worked closely with Charles for a period of time (the length of which is unclear from the record), selling onions over the telephone. Charles told her that her job performance and telephone skills were unsatisfactory and instructed her on how to improve.

There is no persuasive evidence that Titus ever complained to Essau or Helen that Charles called women whores, that he used sexually derogatory language or that he was discriminatory in his treatment of women.[9] The only indication that Titus made any complaint to Helen was Titus's testimony that she asked Helen "to have Chuck treat us a little bit more nicer and not swear at us." (Tr. at 80).

Helen telephoned Borello the night of January 4, 1988 to inform her that she was being laid off because of a lack of work.[10] The proffered reason surprised Borello because her workload during December 1987 had been heavy and she had worked overtime in ten of the fourteen weeks from and including that ending September 26 and to and including that ending December 26. Soon after

Borello's layoff A. Sam's employee Edward LeBarron, who had not previously worked in the office area, moved into Borello's office and assumed many of her duties. He worked overtime during seven of the twelve weeks between December 27, 1987 and March 19, 1988. Also during this period, A. Sam's office employee Jennifer Schrantz was given additional duties (ones Borello had performed previously) resulting in her working overtime in ten of such weeks (an average of 5.63 overtime hours per week).

A. Sam advertised for a bookkeeper February 19, 1988 and hired Oliver Davis as such February 27th. His hiring did not ameliorate Schrantz's workload. Davis's duties included updating accounts payable and truck permits, balancing bankbooks and putting inventory and accounts payable information into the computer. Although Davis had taken college-level accounting classes, his high school accounting and basic office skills were sufficient in fulfilling his duties for A. Sam. Davis resigned in May 1988 despite Helen's request that he stay on. Schrantz quit her payroll job in April 1988 and trained her replacement before she left. A. Sam advertised for a bookkeeper June 1st and July 11th. Further, A. Sam advertised for and hired four additional office workers in the year after Schrantz quit.

Helen laid off Titus January 18, 1988 citing lack of work as the reason. Titus had averaged 5.91 hours overtime per week during

---

**8.** The testimony of Titus was inconsistent and this Court finds it at least partially incredible. For example, she intimated on direct examination that Charles had called her a whore (Tr. at 79), but on cross-examination she stated flatly that Charles had never called her a whore. (Tr. at 98–99). Further, although Borello stated that Charles said "go fuck yourself" during the telephone exchange mentioned above, Titus said she heard Charles call Borello a "whore" during such.

**9.** The plaintiff argues that Titus "voiced her opposition" to Charles's conduct when she was called into Helen's office concerning the telephone incident. However, her testimony indicates only that she "verified" what Charles had said.

**10.** Helen testified that another reason for firing Borello was her unsatisfactory work performance, but this Court finds such testimony in-

credible. For example, Helen, despite A. Sam's practice of giving written or documented oral warnings to employees before they were let go for disciplinary reasons, never gave either to Borello. Also, Helen, before Borello filed her discrimination claim, wrote a letter of recommendation stating that Borello "was a very enthusiastic employee who took great pride in the quality of her work. I would recommend her." *See* Plaintiff's Exh. 2. Further, A. Sam, on Borello's Unemployment Compensation form, listed her layoff as "temporary," a designation A. Sam usually provides only to its good workers that have had to be laid off. (Tr. at 221). As to the testimony of Helen and Essau that they had discussed Borello's layoff months before her complaints about Charles, this Court also finds such incredible because, *e.g.*, of the many discrepancies between their deposition and trial testimony concerning this subject.

the period September 26 through December 26, 1987 and had worked some overtime in January before her layoff. Between November 1987 and January 1988 Titus spent the majority of her work taking orders for and assembling fruit baskets. This work was largely completed by mid-January 1988. Titus also worked on the computer conversion of the accounts payable. This conversion was completed in December 1987, thereby reducing further Titus's workload.

The issues of law before this Court are whether Borello and/or Titus were subjected to "hostile work environment" sexual harassment for which an employer is liable under Title VII, and whether Borello and/or Titus were discharged in retaliation for opposing the alleged harassment.

■■■ Title VII prohibits an employer from discriminating "against any individual with respect to * * * compensation, terms, conditions, or privileges of employment, because of such individual's * * * sex * * *." 42 U.S.C. § 2000e–2(a)(1). Actionable sexual discrimination under this section can be premised on either of two theories—to wit, "*quid pro quo* "[11] or "hostile work environment" sexual harassment. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 64–66, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986). The EEOC alleges only the latter. A plaintiff's workplace is deemed a hostile work environment when, as judged by a reasonable person, it is permeated "with discriminatory intimidation, ridicule and insult" and "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Savings Bank v. Vinson,* 477 U.S. at 65 & 67, 106 S.Ct. at 2405 & 2406, (reaffirmed by *Harris v. Forklift Systems, Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993)). To prevail, a complaining employee must further prove, in light of all the circumstances, that the conduct at issue was unwelcome and that it would not have occurred but for his or her gender. *Harris v. Forklift Systems, Inc.* —— U.S. at ——, 114 S.Ct. at 371; *Carrero v. New York City Housing Authority,* 890 F.2d 569, 578

(2d Cir.1989). An employer is liable if he, she or it "knew or should have known of the harassment in question and failed to take prompt remedial action." *Henson v. City of Dundee,* 682 F.2d 897, 905 (11th Cir.1982).

Turning first to Borello's hostile work environment claims, this Court has found that Charles directed to her his written message, "whore what is the amount??," that Borello overheard Charles yell to Helen that all the girls in the office were "whores and all [they] knew how to do was fuck," that Charles stated "nothing but a whore, nothing but a little whore, just a whore" in Borello's presence, that he told her "why don't you stare at the time clock a little bit more ya whore" and that he shouted "go fuck yourself" to her over the telephone. The defendant concedes that Borello (and Titus) found Charles's comments unwelcome, but argues that the conduct Borello complains of was not "sufficiently pervasive or severe" to be characterized fairly as a hostile environment because the incidents were sporadic and isolated and were not sexual in nature.

■■■ As to an overtly sexual nature of workplace comments, the defendant has cited no case that suggests such is essential to demonstrate an actionable hostile environment. To the contrary, the relevant caselaw clearly rejects this suggestion. *See Hall v. Gus Const. Co., Inc.,* 842 F.2d 1010, 1014 (8th Cir.1988) (offensive conduct need not be explicitly sexual); *McKinney v. Dole,* 765 F.2d 1129, 1140 (D.C.Cir.1985) (district court erred in assuming that incident of physical force could not constitute sexual harassment unless "explicitly sexual"); *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1485 (3d Cir. 1990) (harassing intimidation or ridicule need not be explicitly sexual). Whether Charles's conduct was sufficiently severe and pervasive is more problematic. Given that the number of incidents (five) and the time within which they occurred (the month of December 1987) were limited, that one of the incidents involved merely overhearing a demeaning comment and that another of the incidents—*viz.,* Charles telling Borello over the telephone to

---

**11.** Under this theory, a plaintiff must establish that her rejection of her supervisor's sexual advances caused her to be denied an economic benefit.

"go fuck [her]self"—, while vulgar, was not gender-specific and is of little relevance where, as here, no evidence was introduced that he used this language with women only, *see Katz v. Dole*, 709 F.2d 251, 256 (4th Cir.1983) (Title VII is not a "clean language act"),[12] the instant factual situation is at best toward the lower end of the spectrum of actionable conduct. As the United States Court of Appeals for the Second Circuit has stated, "[t]he [harassing] incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief," *Kotcher v. Rosa & Sullivan Appliance Center, Inc.*, 957 F.2d 59, 62 (2d Cir.1992), and the defendant tenably argues that the incidents alleged are indeed isolated and occasional within the meaning of *Kotcher*. However, despite the just-quoted language in *Kotcher*, the United States Court of Appeals for the Second Circuit has also stated in *Carrero, supra*—the case cited in *Kotcher* to support the just-quoted language—that

> "A female employee need not subject herself to an extended period of demeaning and degrading provocation before being entitled to seek the remedies provided under Title VII. It is not how long the sexual innuendos, slurs, verbal assaults, or obnoxious course of conduct lasts. The offensiveness of the individual actions complained of is also a factor to be considered in determining whether such actions are pervasive." *Carrero*, 890 F.2d at 578.

In other words, infrequency, while relevant, is not alone dispositive. Rather, it is inversely related to the severity of the incidents— *i.e.*, the greater the severity of the individual incidents, the fewer there need to be actionable (and *vice versa*).[13] This is consistent with the United States Supreme Court's most recent examination in *Harris, supra*, of the legal standard governing hostile environment sexual harassment. Therein the Court, noting that determining whether a workplace is hostile does not admit of a "mathematically precise test," stated that one must examine "all the circumstances" and listed "the fre-

quency of the discriminatory conduct" as but one factor. —— U.S. at ——, 114 S.Ct. at 371. The other factors in its nonexhaustive list are "its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Ibid.* Further, the Court emphasized that "no single factor is required."

■ With these factors as a guide, this Court concludes that the incidents alluded to above, in light of all the circumstances, together represent a sufficient quantum of harassment to constitute a hostile work environment vis-a-vis Borello. Although the incidents were not numerous, they were repeated and severe. Not only did Charles call Borello a "whore," but he referred to her as such in a written communication, left in big, bold print on her desk. The severity of the incidents was enhanced further in that Charles, as vice president of the company and son of the president, was not merely an obnoxious co-worker but rather had presumptive authority over Borello. Further, Charles's conduct was "humiliating" rather than "a mere offensive utterance" in that a man calling a woman a "whore"—thereby reducing her to an illicit sexual being—is a direct affront to her self-respect rather than a simple vulgarity that might offend her sensibilities. Finally, as evidenced by Borello's testimony that Charles's comments reduced her to tears (Tr. at 47), demeaned and upset her (Tr. at 50) and made her feel "hopeless", "really lousy", and "on edge" (Tr. at 53), for a woman to be repeatedly called a whore by the vice-president of her company "unreasonably interferes" with her work performance. *Harris, supra*.

■ This Court further concludes that Charles's conduct would not have occurred but for Borello's gender. Although Charles testified that he referred to his customers as whores and told them to "go fuck themselves," he did not refer to the male office workers in that manner. (*See* LeBarren testimony, Tr. at 156 and Davis testimony, Tr.

---

12. *See also Harris, supra* (hostile environment exists if workplace "is permeated with *discriminatory* intimidation, ridicule and insult") (emphasis added).

13. *See also King v. Board of Regents*, 898 F.2d 533, 537 (7th Cir.1990) (a single incident is actionable if sufficiently intense).

at 144). In addition, the term "whore" is usually gender-specific and is certainly more offensive when directed at a woman.[14] Thus the inference is sufficiently strong that Charles's conduct was directed at Borello because she was a woman.[15] In addition, the evidence shows that A. Sam's president Essau and its corporate secretary Helen knew of Charles's harassment and failed to take remedial action. Consequently, A. Sam is liable for Charles's behavior. *See Henson, supra,* 682 F.2d at 905.

■ Less compelling are Titus's claims that she was subjected to hostile environment sexual harassment. Although she, on three occasions, overheard Charles through the walls of his office refer to the women in the office as "whores," Titus herself stated that Charles never called her a whore (Tr. at 98–99) and there is no persuasive evidence that he ever directly referred to or spoke to her in a sexually abusive or even vulgar manner. Titus did testify that she "found [Charles] to be very insulting," that "he was very degrading" and that "didn't like women too much" but such generalities have little evidentiary weight because this Court cannot ascertain whether Titus was reasonable [16] in characterizing as "degrading and insulting" the implied, unspecified-to-this-Court behavior of Charles that allegedly occasioned her opinion.[17]

The only other incidents that are alleged to have created a hostile environment are that Borello showed to Titus the delivery slip upon which was written "whore what is the amount??" and that Titus overheard Charles

tell Borello on the telephone to go fuck herself (which Titus either misheard or misremembered, for she testified that Charles had on this occasion called Borello a whore). As to the latter incident, its severity was slight because it was not directed at Titus and because it was a non-gender-specific vulgarity more properly characterized as "offensive" than "humiliating" under the *Harris* criteria. Further, there is no evidence that Charles directed this term only at women, weakening any suggestion that he used this term in a discriminatory fashion (*see, supra,* note 14). Re the delivery slip, "whore" is a humiliating, gender-specific term, but, again, its severity was blunted in that it was not directed at Titus. The plaintiff correctly cites *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415–1416 (10th Cir.1987), for the proposition that discriminatorily abusive conduct directed at a plaintiff's co-workers can be used as evidence that a hostile environment existed, but nothing in *Hicks* suggests that such evidence is not less weighty than conduct directed at such plaintiff or that a few such indirect incidents could establish a hostile environment.

This Court concludes, in light of all the circumstances, that the instant factual situation does not establish that Titus was subjected to hostile-environment sexual harassment. Not only were the incidents few, but their severity was mitigated significantly by the fact that they were not directed at Titus. This is true especially of the "whore" comments Charles uttered in his office, which were not directed at any individual and which

14. Some courts have held that instances of sexual conduct that are equally offensive to male and female workers do not constitute sexual harassment. *See Rabidue v. Osceola Ref. Co.,* 805 F.2d 611, 620 (6th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987); *see also Sheehan v. Purolator, Inc.,* 839 F.2d 99, 105 (2d Cir.1988), *cert. denied,* 488 U.S. 891, 109 S.Ct. 226, 102 L.Ed.2d 216 (1988) (defendant not liable where supervisor was equally abusive to male and female workers).

15. The inference is strengthened by the fact that Charles called office worker Tammy Mowrey, in 1983, a "fucking-slut" and by his statement that "all the *girls* are whores and all they're good for is * * * fucking." (Tr. at 126). (Emphasis added).

16. Whether a hostile environment exists is judged by a "reasonable person" standard. *See Harris, supra.*

17. In fact, this Court suspects she was unreasonable in her characterization of the unspecified behavior. For example, on cross-examination Titus suggested that Charles had demeaned and degraded her because he had told her she "wasn't doing a good enough job" in her telephone solicitation for onion sales, and had instructed her on how to do a better job. (Tr. at 97). (No suggestion was made that Charles only criticized the female employees' work.)

Titus merely overheard because the walls happened not to be soundproof.

■ Turning next to the plaintiff's claims of retaliation, under Title VII it is "an unlawful employment practice for an employer to discriminate against any of his employees * * * because [the employee] has opposed any practice made an unlawful employment practice by this subchapter * * *." 42 U.S.C. § 2000e–3(a). To establish a *prima facie* case of retaliation, an employee-plaintiff must show that he or she engaged in protected participation or opposition under Title VII, that the employer was aware of this activity, that the employer took adverse action against such plaintiff and that a causal connection exists between the protected activity and the adverse action—*i.e.*, that a retaliatory motive played a part in the adverse employment action. *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir. 1980). The opposition may take the form of informal protests (*e.g.*, complaints to management) of discriminatory employment practices and it is protected so long as the employee-plaintiff reasonably believes that the underlying employment practice opposed is discriminatory. *Grant v. Hazelett Strip–Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir. 1989). A causal connection can be established through circumstantial evidence—*e.g.*, by showing that the protected activity was closely followed in time by the adverse action. *Davis v. State University of New York*, 802 F.2d 638, 642 (2d Cir.1986). Once a *prima facie* case is established, "the burden of production shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason' for its action. * * * If they [sic] do so, the burden then shifts back to the plaintiff 'to demonstrate that the proffered reason was not the true reason' for the decision, *i.e.*, that the articulated reason is a pretext." *Sumner*

*v. U.S. Postal Service*, 899 F.2d 203, 209 (2d Cir.1990).

■ Titus has failed to establish a *prima facie* case of retaliation because there is insufficient evidence to show that she opposed a practice she reasonably believed was discriminatory. Titus did testify that she complained to Helen of Charles's conduct, but when asked to articulate the substance of those complaints, she said she had asked Helen "to have Chuck treat us a little bit more nicer and not swear at us." (Tr. at 80). Not being "nice" tenably could be a discriminatory practice only if it were shown that Charles was not nice only to women, but the plaintiff has made no such showing. *See Sheehan, supra*, 839 F.2d at 105 (discrimination claim does not lie where supervisor was indiscriminately ill-tempered to men and women). Swearing too could only be discriminatory if it were shown that Charles swore only at women,[18] but the plaintiff again has made no such showing. (As mentioned, Title VII is not a clean language act. *See Katz, supra*.) Swearing might also be discriminatory if it included gender-specific terms, but Titus did not particularize as to the swear words used and there is no persuasive evidence that she was implying that she had complained to Helen about gender-specific swearwords being used.[19] Generally, because Titus's testimony is so vague as to what she complained of to Helen, there is an insufficient basis for this Court to determine that Titus was reasonable in believing (if she in fact she did so believe, which too is unclear) that the complained of conduct was discriminatory.

The plaintiff argues, citing Titus's testimony, that Titus "voiced her opposition" to Helen after the telephone incident involving Charles and Borello, but the record does not support this characterization. Titus stated only that she verified for Helen what she had

---

18. The plaintiff did establish that two of the male office workers were never called "whores" by Charles, but no testimony was elicited re whether he discriminated between men and women in his swearing practices generally. In fact, the available evidence suggests he did not swear only at women, for he testified that he often told his customers "to go fuck themselves." (Tr. at 297).

19. The plaintiff might argue that such was the implication because just prior to this testimony Titus had stated she had overheard Charles calling women in the office whores. However, *inter alia*, given the flip-flops in her testimony as to whether she was personally called a whore and her faulty memory and/or perception that Charles had called Borello a whore over the telephone, this Court doubts Titus's credibility, and thus is unwilling to draw this inference.

heard Charles say to Borello over the telephone. (Tr. at 81–82). Thus, here too the plaintiff has failed to meet its evidentiary burden to establish that Titus opposed a discriminatory practice.

■ Assuming, *arguendo*, that Titus had established a *prima facie* case, her claim would still fail. That, *inter alia*, two of the major projects upon which Titus worked—*i.e.*, the fruit baskets and the computer conversion—were either completed or near completion just prior to her layoff persuades this Court that A. Sam had a legitimate, nondiscriminatory reason for dismissing Titus. Further, there is insufficient credible evidence to sustain the plaintiff's burden of proving that these reasons were a pretext; for example, given that Titus made no complaints of discrimination the defendant had no discernable retaliatory motive to dismiss her. Further, that Titus was not dismissed until two weeks after Borello's dismissal and that she was dismissed before Borello filed a complaint with the EEOC weakens the suggestion that the defendant's retaliatory motives in firing and not rehiring Borello (see below) extended to Titus.

■ The evidence clearly establishes a *prima facie* case of retaliation against Borello. She voiced to Helen and Essau on several occasions her opposition to Charles's discriminatory and abusive conduct, and she was fired within a week of the last time she complained of such. This short time frame between the protected activity—*i.e.*, complaining of discriminatory treatment—and the adverse employment action—*i.e.*, being laid off—suffices to establish the requisite causal connection between the two. *Davis*, 802 F.2d at 642. Although the defendant articulated nondiscriminatory reasons (*e.g.*, that there was a lack of work and that Borello's work performance was inadequate) for its actions, the preponderance of the evidence establishes that these proffered reasons are pretextual. As to the alleged lack of work, although A. Sam did have fewer employers during the winter months, this was mainly the result of its farm workers—not office

workers—being laid off. Regardless, this Court credits Borello's testimony that she had finished only half of the computer conversion work in which she was engaged.[20] Her testimony is buttressed by the fact that she had been working overtime during the period immediately preceding her layoff and that Oliver Davis, who was hired as a bookkeeper after Borello's layoff, was doing computer conversion work well after Borello's departure. That A. Sam, within weeks of the layoff, advertised for a bookkeeper and hired Davis also furthers the inference that the "lack of work" rationale is pretextual, for the type of bookkeeping work Davis engaged in, although different in some respects than what Borello had been doing, was well within Borello's demonstrated capabilities.

This Court also finds pretextual A. Sam's explanation that it was dissatisfied with Borello's work performance. Not only was there no documentation that A. Sam had ever been dissatisfied with Borello's work, but, as mentioned, Helen wrote for Borello a letter of recommendation, and Borello's layoff was characterized as "temporary" on the unemployment form, a characterization A. Sam gave to its good workers.

Having found that A. Sam sexually harassed Borello and that it retaliated against her for opposing such, she is entitled to damages. Under 42 U.S.C. § 2000e–5(g)(1), if a defendant has intentionally engaged in an unlawful employment practice, a

> "court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include * * * [the payment of] backpay * * * or any other equitable relief as the court deems appropriate."

This Court in its discretion awards backpay of $2,381.60 (representing the money Borello would have earned during the approximately five-month period between her layoff and her subsequent employment elsewhere), together with prejudgment interest thereon compounded monthly, at the I.R.S.

---

**20.** As mentioned *supra,* this Court does not credit Helen's and Essau's testimony that they had discussed the layoff months before.

adjusted prime rate as set forth in 26 U.S.C. § 6621 *et seq.*[21]  *See Clarke v. Frank,* 960 F.2d 1146, 1153–1154 (2d Cir.1992).

Accordingly, it is hereby **ORDERED** that A. Sam & Sons Produce Company, Inc. pay the plaintiff Borello's backpay and prejudgment interest thereon as set forth in the preceding paragraph.

**21.** *I.e.,* 11% for the period January through March 1988, 10% for the period April through September 1988, 11% for the period October 1988 through March 1989, 12% for the period April through September 1989, 11% for the period October 1989 through March 1991, 10% for the period April through December 1991, 9% for the period January through March 1992, 8% for the period April through September 1992 and 7% for the period October 1992 to the present.