**Carla IANNONE, Plaintiff,**

v.

**FREDERIC R. HARRIS, INC., Defendant.**

**No. 93 Civ. 4865 (JGK) (JCF).**

United States District Court, S.D. New York.

Sept. 24, 1996.

---

Domenick Crispino, Crispino & Ricco, P.C., New York City, for plaintiff.

Amy J. Beech, Epstein Becker & Green, P.C., New York City, for defendant.

## MEMORANDUM OPINION & ORDER

FRANCIS, United States Magistrate Judge.

Obscenity, like beauty, is often in the eye of the beholder. The subjective nature of obscenity has an impact not only on First Amendment jurisprudence, *see Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (while acknowledging difficulty of defining obscenity, Justice Stewart stated, "I know it when I see it") (Stewart, J., concurring), but also, as this case demonstrates, on claims of gender discrimination.

The plaintiff in this action, Carla Iannone, contended that her employer, Frederic R. Harris, Inc. ("Frederic R. Harris"), created a hostile work environment that constituted sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Ms. Iannone further argued that she was unlawfully terminated in retaliation for her complaint about having to work on an assignment involving what she considered a sexually explicit picture.

The parties consented to my jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c), and a jury trial was held. The jury rejected Ms. Iannone's claims of sexual harassment based on a hostile work environment, but it found that she had been subjected to a retaliatory discharge. The jury awarded the plaintiff $62,000 in back pay, $5,000 in compensatory damages, and $250,000 in punitive damages.

Frederic R. Harris now moves pursuant to Rule 50 of the Federal Rules of Civil Procedure for judgment as a matter of law or, in the alternative, for a new trial pursuant to Rule 59(a). The defendant contends that it did not retaliate against Ms. Iannone for "protected activity" because she did not reasonably believe that the conduct she complained of constituted sexual harassment. Frederic R. Harris also seeks a new trial or remittitur with respect to the awards of back pay and punitive damages.

*Background*

Frederic R. Harris is an engineering consulting firm. (Tr. 42).[1] In January 1989, Ms. Iannone joined the company as a graphic artist (Tr. 42–43), and in 1991, she was promoted to the position of Manager of New York Graphics. (Tr. 43–44).

At trial, Ms. Iannone testified about several incidents during her tenure at Frederic R. Harris that led to her charges of a hostile work environment. According to the plaintiff, a male employee repeatedly pinched her on the arm and waist and commented on the jogging outfit she wore for a corporate running race. (Tr. 48–50). On another occasion, Anthony Posch, the president of Frederic R. Harris, organized a din-

ner to recognize the accomplishments of Ms. Iannone's group. She was uncomfortable, however, because she perceived the event to be arranged like a "date" and because Mr. Posch was openly affectionate with another employee, April Dewland, who was then his girlfriend and later became his wife. (Tr. 67–69, 114–16). Ms. Iannone also testified that Frederic R. Harris had an informal policy barring women from wearing pants in the office. (Tr. 51–52). The plaintiff never complained about these incidents, in part because she did not believe that she would be taken seriously and in part because, as far as she knew, Frederic R. Harris did not have an equal employment officer at that time. (Tr. 50–51). At the conclusion of the trial, the jury determined that Ms. Iannone had not sustained her burden of demonstrating that she had been subjected to a hostile work environment.

Ms. Iannone's claim of retaliation arose out of an incident involving a viewgraph, that is, a picture prepared for projection onto a screen. In July 1992, Mr. Posch was preparing a presentation on leadership skills for the company's Young Associates Forum, a series of training sessions. (Tr. 57–58). His secretary sent Ms. Iannone copies of the materials to be transformed by the graphics department into viewgraphs for the presentation. (Tr. 58). Among these was a photograph that Ms. Iannone considered sexually suggestive. (Tr. 58). It depicts the face and bare shoulder of a woman who appears to be removing a jacket. Def.Exh. AJ at 23. The picture had been taken from *Playboy* magazine (Tr. 440), and the original that the plaintiff was given had a photograph of a nude woman on the reverse side. (Tr. 58, 222). Mr. Posch intended to use the picture, along with one of the "Marlboro Man," to illustrate the point that beauty is not an attribute of leadership. (Tr. 440; Def.Exh. AJ at 24).

After receiving the materials for the Young Associates Forum, Ms. Iannone called Jennifer Zimmerman, one of the graphics department employees, into her office. Ms. Zimmerman was shocked at the picture Mr. Posch had selected, and she asked Ms. Ian-

---

1. "Tr." refers to the trial transcript.

none not to be assigned to work on it. (Tr. 221–23). The plaintiff also spoke to other graphics department employees about the picture. (Tr. 59).

Ms. Iannone then met with Mr. Posch to review the materials for the presentation. She told him that she and others in her department were uncomfortable with the picture he had selected and did not want to be involved with it. (Tr. 60–61). Mr. Posch responded heatedly that the picture was not lewd, immoral, or illegal, and he told the plaintiff that it was not something she should resign over. (Tr. 61–62). After discussing the issue further with Frederic R. Harris' general counsel and with a supervisor, Ms. Iannone ultimately prepared the viewgraph. (Tr. 62–65).

On October 6, 1992, Ms. Iannone was terminated. She was informed of her discharge by Ms. Dewland, who told her in substance that she had not been keeping up with technological changes in computer graphics. (Tr. 75, 373–74). Following the termination, Ms. Dewland filed a performance evaluation for Ms. Iannone that reiterated this criticism, and that also found fault with her responsiveness to direction and her ability to work on team projects. (Def.Exh. W). Prior to her termination, Ms. Iannone had received three annual evaluations, including one made shortly after she had become manager of the graphics department. In each case she received ratings of good or excellent in every category. (Def.Exh. C, H, R).

On the basis of this evidence, the jury found that Ms. Iannone had been discharged in retaliation for her complaint about the sexual content of the viewgraph.

*Discussion*

A. *Jurisdiction*

█ As a threshold matter, the plaintiff questions my jurisdiction to entertain the defendant's motion at this time. She contends that by filing a notice of appeal, the defendant has ousted this Court of jurisdiction. But Rule 4(a)(4) of the Federal Rules of Appellate Procedure states in pertinent part: "If any party files a timely motion [for judgment under Rule 50(b)], the time for appeal for all parties runs from the entry of the order disposing of the last such motion outstanding." The effect of this rule on the district court's jurisdiction is made clear by the advisory committee notes to the 1993 amendment:

> The amendment provides that a notice of appeal filed before the disposition of a specified posttrial motion will become effective upon disposition of the motion. A notice filed before the filing of one of the specified motions or after the filing of a motion but before the disposition of the motion is, in effect, suspended until the motion is disposed of, whereupon, the previously filed notice effectively places jurisdiction in the court of appeals.

Fed.R.App.Pro. 4 advisory committee's note. Thus, jurisdiction remains in the district court while the notice of appeal is effectively suspended pending determination of a posttrial motion.

B. *Judgment as a Matter of Law or New Trial*

1. *Legal Standards*

█ Judgment as a matter of law under Rule 50(a), formerly known as judgment notwithstanding the verdict, is proper

> only if the evidence viewed in the light most favorable to the nonmovants, without considering credibility or weight, reasonably permits only a conclusion in the movant's favor. In other words, there must be either an utter lack of evidence supporting the verdict, so that the jury's findings could only have resulted from pure guesswork, or the evidence must be so overwhelming that reasonable and fair-minded persons could only have reached the opposite result.

*Doctor's Associates, Inc. v. Weible,* 92 F.3d 108, 111–12 (2d Cir.1996).

█ The standard for granting a new trial under Rule 59(a) is less deferential to the jury's verdict. The trial judge may weigh conflicting evidence and need not view the record in the light most favorable to the nonmoving party. *See Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1047 (2d Cir. 1992); *Koerner v. Club Mediterranee, S.A.,* 833 F.Supp. 327, 331 (S.D.N.Y.1993). A new trial should be ordered when "the jury has reached a seriously erroneous result or the

**410**

verdict is a miscarriage of justice." *Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d 363, 370 (2d Cir.1988).

### 2. *The Retaliation Claim*

 Title VII not only outlaws employment discrimination, it also prohibits an employer from retaliating against an employee who complains about discrimination. Section 704(a) of the Civil Rights Act of 1964 provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter...." 42 U.S.C. § 2000e–3(a). In order to establish a prima facie case of retaliation, "an employee must show that the employee was engaged in protected activity; that the employer was aware of that activity; that the employee suffered adverse employment decisions; and that there was a causal connection between the protected activity and the adverse employment action." *Manoharan v. Columbia University College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988) (citations omitted). If the plaintiff succeeds in making out a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. The burden then shifts back to the plaintiff to demonstrate that the defendant's proffered rationale is pretextual and that the employer's action was in fact retaliatory. *See Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 46 (2d Cir.1980); *Volberg v. Pataki,* 917 F.Supp. 909, 914 (N.D.N.Y.1996). A violation of Title VII may be found if the adverse employment action was based in part on a retaliatory purpose, even if that was not the sole motive. *See Davis v. State University of New York,* 802 F.2d 638, 642 (2d Cir.1986).

Frederic R. Harris now challenges only one element underlying the jury's verdict: the finding that Ms. Iannone was engaged in protected activity. There is no question that the employer was aware of her complaint, since she registered it directly with the company president. Nor is there any doubt that Ms. Iannone suffered an adverse employment decision, since she was terminated. Finally, although Frederic R. Harris contested

the causation element at trial, the defendant has not resurrected that issue in the current motion.

 Protected activity includes the registering of a complaint about a Title VII violation. The complaint need not be a formal claim filed with a court or administrative agency; it may simply be an objection voiced to the employer. *See Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d 1564, 1569 (2d Cir.1989); *E.E.O.C. v. A. Sam & Sons Produce Co.,* 872 F.Supp. 29, 37 (W.D.N.Y.1994). Moreover, the plaintiff in a retaliation case need not demonstrate that the conduct complained of was in fact a violation of Title VII. *See Davis,* 802 F.2d at 642. Rather, the plaintiff must establish that he or she was acting under the good faith, reasonable belief that such a violation existed. *See Grant,* 880 F.2d at 1569; *Manoharan,* 842 F.2d at 593. Accordingly, a good faith mistake, whether of fact or law, regarding the legality of the employer's conduct will not strip the plaintiff of Title VII protection against retaliation. *See Moyo v. Gomez,* 32 F.3d 1382, 1385 (9th Cir.1994). Whether an erroneous complaint was asserted in good faith will be determined in part by the extent of the plaintiff's legal sophistication. *See id.* at 1385–86 (reasonableness standard must make due allowance for limited knowledge of most Title VII plaintiffs). Thus, for example, an attorney or equal employment opportunity specialist will be held to a higher standard of expertise about Title VII than a layperson. *See Amos v. Housing Authority of Birmingham Dist.,* 927 F.Supp. 416, 422 (N.D.Ala.1996) ("When a person skilled in human relations and trained to defend EEOC charges makes a claim that has no logical basis, that claim could not have been made in good faith...."); *Volberg,* 917 F.Supp. at 914 (general counsel held to standard of reasonable attorney in assessing good faith).

 Here, Frederic R. Harris contends that Ms. Iannone did not have a reasonable, good faith belief that requiring her to work on the viewgraph constituted sexual harassment in violation of Title VII. As with complaints about any other form of discrimination, "[o]pposition to sexual harassment is protected from retaliation by an employer." *Magnuson v. Peak Technical Services, Inc.,* 808 F.Supp. 500, 515 (E.D.Va.1992). More-

over, sexual harassment is not limited to unwanted physical touching; it can also consist of the display of obscene visual representations or the communication of sexually offensive remarks. *See, e.g., Baskerville v. Culligan International Co.,* 50 F.3d 428, 430–31 (7th Cir.1995) (pornographic pictures may be element of sexual harassment claim); *Trent v. Valley Electric Ass'n, Inc.,* 41 F.3d 524, 525–27 (9th Cir.1994) (retaliation plaintiff reasonably believed that use of foul language and sexually offensive references by instructor at meeting constituted sexual harassment). Thus, if Ms. Iannone reasonably believed the viewgraph to be sexually offensive, then her complaint about it constituted protected activity.

■ Certainly not everyone would share the plaintiff's sensitivity about the picture in question. It is a head and shoulders shot of an attractive woman with a mildly provocative expression. Much contemporary media advertising comes far closer to pornography than does this photograph. The viewgraph would stir an extreme reaction only in "a woman of Victorian delicacy—a woman mysteriously aloof from contemporary American popular culture in all its sex-saturated vulgarity." *Baskerville,* 50 F.3d at 431. Thus, as the jury found, the viewgraph, even coupled with the plaintiff's other allegations of harassment, did not amount to direct gender discrimination.

■ Nevertheless, the belief that it did was not unreasonable. The photograph did, after all, come from an erotic magazine and was intended to be sexually suggestive. A nude woman was depicted on the reverse side. Moreover, Ms. Iannone was not alone in her reaction; other women on her staff were offended as well. Thus, she could reasonably believe that requiring her to work with the photograph constituted sexual harassment in violation of Title VII.

The defendant argues, however, that Ms. Iannone in fact had no such belief. Frederic R. Harris relies on testimony where the plaintiff declined to characterize the viewgraph as "illegal" and instead referred to it as immoral or inappropriate. (Tr. 98, 100). But that testimony appears to have referred to the legality of the viewgraph itself, not to

the conduct of Mr. Posch in demanding that Ms. Iannone work on it. In order to be the instrument of harassment, a sexual depiction need not be so obscene as to be "illegal" in the sense that its distribution could be banned without violating the First Amendment. By admitting that the photograph was not itself illegal, Ms. Iannone did not suggest that she thought that Mr. Posch could legally require her to prepare it.

The plaintiff, then, did engage in protected activity when she complained of her assignment. The defendant's motion for judgment as a matter of law or for a new trial is therefore denied.

### C. *Remittitur*

■ When a trial court finds a damage verdict to be excessive, it may order a new trial on all issues or only on the question of damages. *Tingley Systems, Inc. v. Norse Systems, Inc.,* 49 F.3d 93, 96 (2d Cir.1995). Alternatively, the court may grant remittitur; that is, it may grant a new trial unless the plaintiff accepts a reduced damage award. *Id.; Earl v. Bouchard Transportation Co.,* 917 F.2d 1320, 1328 (2d Cir.1990). In this case, Frederic R. Harris challenges two aspects of the jury's damage verdict: the back pay award and the assessment of punitive damages.

### 1. *Back Pay*

In the pretrial order, plaintiff's counsel stated that he was seeking an award of approximately $40,000 in back pay. In his summation, he suggested a figure of $50,000. (Tr. 600). The jury awarded back pay of $62,000. The defendant contends that there was no evidentiary basis for that verdict and that the maximum award supported by the record is $15,607.[2]

■ The purpose of Title VII remedies, including back pay, is to make whole the victim of unlawful discrimination. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418–19, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). Such victims should be "restored to the economic position they would have occupied but for the intervening unlawful conduct of employers." *Rodriguez v. Taylor,* 569 F.2d 1231, 1238 (3d Cir.1977), *cert. denied,*

---

**2.** Although neither party has addressed it, there

is a substantial question whether back pay is an

436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978). At the same time, Title VII plaintiffs should not be made more than whole; that is, they should not receive a windfall. *See Munnelly v. Memorial Sloan Kettering Cancer Center*, 741 F.Supp. 60, 62 (S.D.N.Y.1990) (age discrimination case). Accordingly, a back pay award may compensate a plaintiff only for lost wages and benefits. It may not be punitive. *See EEOC v. Enterprise Ass'n Steamfitters Local No. 638*, 542 F.2d 579, 591 (2d Cir.1976), *cert. denied*, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977).

▮ At the time of her termination, Ms. Iannone was making an annual salary of $39,000 at Frederic R. Harris. (Tr. 80). Though she had received a substantial raise following her promotion to manager of the graphics department, the record reveals that normal salary increases in the company averaged about five percent annually. (Tr. 312). Thus, had Ms. Iannone not been terminated, she would have received wages at the annual rate of $40,950 for 1993, $42,998 for 1994, and $45,147 for 1995. She voluntarily stopped working in November 1995 (Tr. 134), and her entitlement to back pay therefore ceases at that point. In addition, in order to maintain her health benefits, the plaintiff paid out $200 per month for six months. (Tr. 81). Accordingly, her total losses may be summarized as follows:

| Period | Source | Amount |
| --- | --- | --- |
| 10/92 – 12/92 | Salary: $39,000 per year ($3,250 per month) | $ 8,125 |
| 1/93 – 12/93 | Salary: $40,950 | 40,950 |
| 1/94 – 12/94 | Salary: $42,998 | 42,998 |
| 1/95 – 11/95 | Salary: $45,147 per year ($3,762 per month | 41,382 |
| 10/92 – 3/93 | Payments for health benefits: $200 per month | 1,200 |
| | Total | $134,655 |

Against this amount, it is necessary to offset the income that Ms. Iannone received during the same periods. Under Title VII, "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e–5(g)(1). Following her discharge, Ms. Iannone did freelance work for about five months for which she earned approximately $7,000. (Tr. 80–81). She was then hired by Pressman Toys in April 1993 at an annual salary of $35,000. (Tr. 79). She subsequently received increases to $38,000 in July 1993, to $40,000 in July 1994, and to $42,000 in July 1995. (Tr. 79).

Ms. Iannone also received about $300 per week in unemployment benefits for the period immediately after her termination (Tr. 80), and the defendant contends that the amount of these payments should also be deducted from the back pay award. In *EEOC v. Enterprise Ass'n Steamfitters*, 542 F.2d at 591, the Second Circuit held that such a deduction is permissible as a matter of equity. However, in *Promisel v. First American Artificial Flowers, Inc.*, 943 F.2d 251, 258 (2d Cir.1991), *cert. denied*, 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992), the Circuit noted that it had not decided whether such a deduction should be automatic. Moreover, because unemployment benefits are paid by a state agency rather than by the employer directly, one of the parties in a Title VII case will receive a windfall no matter how the benefits are treated in connection with back pay. If they are deducted from the award, then the employer will have avoided paying the plaintiff's full wages for some period after having illegally terminated the plaintiff. Conversely, if they are not deducted, the plaintiff will receive more money in total for the period of unemployment than if he or she had remained employed.

issue for the jury at all. In the Civil Rights Act of 1991, Congress amended Title VII to provide for a jury trial for a plaintiff seeking compensatory or punitive damages. 42 U.S.C. § 1981a(c)(1). However, compensatory damages were defined as excluding back pay, implying that back pay remains an issue for the court rather than the jury. 42 U.S.C. § 1981a(b)(2); *see Dailey v. So-*

*ciete Generale*, 889 F.Supp. 108, 111–12 (S.D.N.Y.1995); 4 Leonard B. Sand, et al., *Modern Federal Jury Instructions* ¶ 88.03[2][a], at 88–173 (1996).

I need not fully address that issue at this time, but will decide it in the event that the plaintiff declines remittitur and opts for a new trial.

Since the windfall is unavoidable, it better serves the purposes of Title VII for the victim rather than the perpetrator of discrimination to be the beneficiary. *See Dailey*, 889 F.Supp. at 113. Therefore, I will not deduct Ms. Iannone's unemployment compensation payments from her back pay.

The offsets, then, may be summarized as follows:

| Period | Source | Amount |
| --- | --- | --- |
| 10/92 – 3/93 | Freelance work | $ 7,000 |
| 4/93 – 6/93 | Salary: $35,000 per year ($2,916 per month) | 8,748 |
| 7/93 – 6/94 | Salary: $38,000 per year | 38,000 |
| 7/94 – 6/95 | Salary: $40,000 per year | 40,000 |
| 7/95 – 11/95 | Salary: $42,000 per year ($3,500 per month) | 17,500 |
| | Total | $111,248 |

Thus, the maximum back pay award justified by the evidence is the difference between $134,655 and $111,248, or $23,407.

■ In addition, Ms. Iannone is entitled to prejudgment interest on the back pay award. Such interest is an element of complete compensation for a Title VII plaintiff. *See Loeffler v. Frank*, 486 U.S. 549, 558, 108 S.Ct. 1965, 1971, 100 L.Ed.2d 549 (1988). Indeed, it is generally an abuse of discretion not to award interest, since that would reward the employer who has violated Title VII by effectively providing it with an interest-free loan. *See Clarke v. Frank*, 960 F.2d 1146, 1153–54 (2d Cir.1992). The judgment shall therefore include interest on the back pay award at the average annual United States treasury bill rate, compounded annually. *See Dailey*, 889 F.Supp. at 114 n. 4.

### 2. Punitive Damages

■ Frederic R. Harris first contends that any award of punitive damages is improper because this form of relief was not identified in the pretrial order. Pursuant to Rule 16 of the Federal Rules of Civil Procedure, the pretrial order controls the course of the trial but may be modified to prevent manifest injustice. *See Madison Consultants v. Federal Deposit Insurance Corp.*, 710 F.2d 57, 62 n. 3 (2d Cir.1983); *Laguna v. American Export Isbrandtsen Lines, Inc.*, 439 F.2d 97, 101 (2d Cir.1971) ("[W]e have not viewed … modification [of pretrial orders] with hostility."). Modification is appropriate where the parties would not be prejudiced and efficient administration of the litigation would not be unduly impaired. *See McFadden v. Sanchez*, 710 F.2d 907, 911–12 (2d Cir.), *cert. denied*, 464 U.S. 961, 104 S.Ct. 394, 78 L.Ed.2d 337 (1983); *Laguna*, 439 F.2d at 101–02; *Eldridge v. Springs Industries, Inc.*, 882 F.Supp. 356, 358 (S.D.N.Y.1995); *Davidson Pipe Co. v. Laventhol & Horwath*, 125 F.R.D. 363, 369 (S.D.N.Y.1989).

■ Those requirements were met here. The plaintiff included in the complaint a demand for punitive damages. Although the pretrial order did not allude to punitive damages, both the plaintiff and the defendant submitted proposed jury instructions on that issue. It was not until the last conference before trial that defendant's counsel argued that the plaintiff should be precluded from seeking this relief. Thus, the defendant was fully prepared to litigate punitive damages at trial and was not prejudiced by being required to do so. By contrast, the plaintiff would have been significantly prejudiced if, solely because of an oversight by counsel, she were deprived of the opportunity to obtain exemplary damages. Furthermore, since both parties had prepared for trial with the evident expectation that they would litigate punitive damages, allowing the plaintiff to advance that claim did not disrupt orderly trial procedures. Modification of the pretrial order was therefore warranted, and the issue of punitive damages was properly submitted to the jury.

■ The defendant further argues that, even if some award of punitive damages was permissible, the verdict here was excessive. In reviewing a damage award, the court must construe the evidence in the light most favorable to the nonmoving party. *See Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 683 (2d Cir.1993). Only if the award is so

excessive as to shock the conscience of the court may it be reduced. *Id.*

■■■■■■ These general standards must be applied in conjunction with the guidelines that apply more specifically to punitive damage awards. In *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 454, 113 S.Ct. 2711, 2718, 125 L.Ed.2d 366 (1993), the Supreme Court held that the Due Process Clause of the Fourteenth Amendment prohibits a state from imposing "grossly excessive" punishment on a tortfeasor in the form of punitive damages. The same principle, embodied in the due process component of the Fifth Amendment, necessarily applies to the award of punitive damages in federal court. In *BMW of North America, Inc. v. Gore*, —— U.S. ——, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Supreme Court identified three categories of factors that should be considered in assessing the validity of a punitive damage verdict. The first is the degree of reprehensibility of the defendant's conduct. *Id.* at —— – ——, 116 S.Ct. at 1599–1601. Thus, an economic harm may merit a less substantial award than physical or emotional injury. *Id.* at ——, 116 S.Ct. at 1599. Similarly, "repeated misconduct is more reprehensible than an individual instance of malfeasance." *Id.* at —— – ——, 116 S.Ct. at 1599–1600 (citation omitted). Thus, a larger exemplary damage award may be imposed upon an employer who has committed multiple violations of Title VII or whose actions are part of an overall pattern of discrimination. *See Emmel v. Coca–Cola Bottling Co.*, 95 F.3d 627, 637 (7th Cir.1996) (upholding adjusted punitive damage award of almost $300,000 on basis of company-wide policy of gender discrimination).

The second consideration identified by the Supreme Court is the ratio of punitive damages to the damages awarded to compensate the plaintiff for the harm suffered. *BMW*, —— U.S. at —— – ——, 116 S.Ct. at 1601–03. The Court endorsed "the principle that exemplary damages must bear a 'reasonable relationship' to compensatory damages." *Id.* at ——, 116 S.Ct. at 1601. However, the proper analysis is not always simply a comparison of punitive damages to the amount of compensatory damages actually awarded by the jury. For example, the court may consider the relationship between exemplary damages and potential future harm from the defendant's conduct as well as harm that has already occurred. *Id.* at ——, 116 S.Ct. at 1602. Moreover,

> low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

*Id.* at ——, 116 S.Ct. at 1602. In addition, because punitive damages are designed to serve a deterrent function, they must take into account the financial circumstances of the defendant. *See TXO*, 509 U.S. at 463, 113 S.Ct. at 2723; *Luciano*, 912 F.Supp. at 672. Thus, punitive damages that in other respects appear to be reasonably related to compensatory damages might be too low to serve as an effective deterrent. Therefore, no rigid ratio can be applied.

Finally, "[c]omparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." *BMW*, —— U.S. at ——, 116 S.Ct. at 1603. This analysis allows the court to gear the punitive damage award to how seriously society as a whole regards the defendant's conduct.

■■■■■■ Each of these factors may now be applied to the facts of this case. The defendant's conduct, while meriting some award of punitive damages, was by no means as reprehensible as that in many other gender discrimination, sex harassment, and retaliation cases. *See Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1356 (7th Cir.1995) (punitive damages reduced in recognition that other sex discrimination cases more egregious). The perceived sexual harassment of which Ms. Iannone complained—the requirement that she prepare the offending viewgraph—was not outrageous. Moreover, the plaintiff was not found to have been subjected to unwanted touching

or demands for sexual relations. The retaliation claim that she did establish was not shown to be part of any pattern of sanctioning employees who complained of alleged harassment. On the other hand, the retaliatory action taken by Mr. Posch was severe. The jury found that in retribution for voicing her concern about the appropriateness of using a suggestive photo in an employee training program, Ms. Iannone was deprived of her livelihood.

With respect to the ratio of punitive to compensatory damages, the jury award was clearly disproportionate. The $250,000 exemplary damage award was fifty times the award of $5,000 that Ms. Iannone received as compensation for her emotional distress. Two factors, however, limit the significance of this disparity. First, unlike the assessment made in a traditional personal injury action, the magnitude of injury to the plaintiff in a Title VII action is not measured solely by the award of compensatory damages; it is also reflected in the size of the back pay award. Although characterized as "equitable," this element of relief is an indicator of the economic losses sustained by the plaintiff and cannot be ignored in judging proportionality. Here, even after adjustment to conform to the record, the back pay award is more than $20,000. Thus, the ratio of punitive damages as awarded by the jury to compensation for actual harm to Ms. Iannone is approximately ten-to-one, not fifty-to-one. Second, the jury was entitled to consider the size of Frederic R. Harris in imposing punitive damages. Although "a defendant's wealth cannot alone justify a large punitive damage award," *Pulla v. Amoco Oil Co.*, 72 F.3d 648, 659 n. 16 (8th Cir.1995), it is one factor properly taken into account in evaluating an appropriate ratio.

Finally, comparing the punitive damage award to analogous statutory penalties is easily done here. The 1991 amendments to Title VII which authorized compensatory and punitive damages also placed a cap on such awards depending upon the size of the employer. Frederic R. Harris employs more than five hundred employees (Tr. 446), and combined compensatory and punitive damages therefore may not exceed $300,000. 42 U.S.C. § 1981a(b)(3)(D). Thus, the jury's $250,000 award represents more than eighty percent of the maximum available under the law. The point at which an award falls within the available range should bear some relation to the egregiousness of the case. *See Emmel*, 95 F.3d at 637; *Hennessy*, 69 F.3d at 1355–56; *but see Luciano*, 912 F.Supp. at 672 ("The Court has reservations as to the reasoning of the Seventh Circuit that the maximum award allowable by Title VII should be reserved for the most egregious cases."). Here, the award was far closer to the statutory maximum than warranted by the defendant's conduct.

On the basis of all of these considerations, the maximum award of punitive damages that would not shock the conscience is $50,000. This amount is consistent with the serious but not repugnant conduct of the defendant in what was a single incident. It represents approximately a two-to-one ratio of punitive damages to compensatory damages and back pay and is significant enough to deter even a company as large as Frederic R. Harris from repeating such retaliation. Finally, it more properly reflects the severity of this case in relation to the maximum available award for the full range of Title VII cases. Accordingly, remittitur is granted to that amount.

*Conclusion*

For the reasons set forth above, the defendant's motion for judgment as a matter of law or for new trial based on the purported failure to prove that the plaintiff engaged in protected activity is denied. The defendant's motion for new trial on damages is denied upon the condition that the plaintiff accept remittitur reducing the award to $23,407 for back pay and to $50,000 for punitive damages. Plaintiff's counsel shall submit a proposed amended judgment on notice by October 15, 1996.

SO ORDERED.